In re William Michael McDANIEL and
Autumn Melissa McDaniel,
Relators.

No. 01–11–00711–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 11, 2011.

Maisie Anne Barringer, Law Office of Maisie Barringer, Houston, TX, Sallee S. Smyth, Attorney at Law, Richmond, TX, for Relators.

Carolyn Cook Robertson, Houston, TX, for Real Party in Interest.

Panel consists of Justices KEYES, HIGLEY, and MASSENGALE.

## OPINION

LAURA CARTER HIGLEY, Justice.

This original mandamus proceeding arises from a suit affecting the parent-child relationship filed by real parties in interest, Teresa Hall ("Terri") and Charles Morgan Hall, Jr. ("Charlie"), to obtain managing conservatorship of their two minor grandchildren, J.M. and R.M. The children's parents, relators, William Michael McDaniel ("Michael") and Autumn Melissa McDaniel ("Autumn"), moved to dismiss the suit, contending that the grandparents lack standing. The trial court denied the motion to dismiss and rendered temporary orders appointing the Halls as managing conservators of J.M. and R.M. The McDaniels bring this original mandamus proceeding requesting this Court to order the trial court to vacate the temporary orders and to sign an order

dismissing the Halls' suit on the ground that the Halls lack standing.[1]

We deny the petition for writ of mandamus.

## Background

On February 16, 2005, Autumn gave birth to J.M. when she was 18 years old. For the first three years of his life, J.M. and Autumn lived with Autumn's parents, Terri and Charlie Hall. During that time, Autumn was in a physically abusive relationship with J.M.'s father. That relationship ended and Autumn began a relationship with Michael McDaniel. The Halls initially liked Michael and supported the relationship between him and their daughter. They also supported Michael's adoption of J.M. at the end of 2009.

On October 2, 2009, Autumn had another son, R.M. Michael is R.M.'s biological father. Michael and Autumn married in May 2010.

Autumn, Michael, and the two boys lived in Houston and would visit the Halls at their home in College Station. On the weekend of August 23, 2010, the McDaniel family visited the Halls at their home. It would be the turning point in the relationship between the McDaniels and the Halls. The events of that weekend involving Michael's actions toward J.M. are in dispute. The Halls claim that they witnessed Michael beating J.M. to the point that it left the six-year old black and blue on one side of his body.

The McDaniels deny that Michael abused J.M. in the manner described by the Halls. They acknowledge that Michael physically disciplined J.M. that weekend but only by spanking him three times on his bottom. The McDaniels contend that the Halls often interfered in their parenting of J.M. and had, during that weekend, engaged in acts that undermined their disciplining of J.M. By the end of the weekend, the relationship between the Halls and the McDaniels was fractured.

Terri contacted Child Protective Services and reported the abuse that she and Charlie claimed to have witnessed at their home. CPS could neither confirm nor rule out that Michael had abused J.M. Thereafter, Michael and Autumn forbade the Halls from seeing J.M. and R.M. Terri did, however, stay in contact with Autumn on Facebook. Autumn permitted the Halls to visit J.M. and R.M. in January 2011. When he found about the visit, Michael was angry. Autumn told her parents that, because Michael was so upset, they could no longer see J.M. and R.M. Autumn cut off communication with her parents in April 2011.

On May 25, 2011, the Halls filed their "Original Petition in Suit Affecting the Parent–Child Relationship," seeking managing conservatorship of J.M. and R.M. Alternatively, the Halls sought possession and access to the children. The petition was supported by the Halls' affidavits.

The McDaniels moved to dismiss the Halls' claim for managing conservatorship. They asserted that the Halls lacked standing to assert the claim because they had not demonstrated that the children's present circumstances significantly impaired their physical health or emotional development.

The trial court conducted an evidentiary hearing on July 19, 2011. The Halls testified that after Michael adopted J.M., they

1. Respondent is the Honorable Sherri Y. Dean, presiding judge of the 309th Judicial District Court of Harris County. The underlying case is *In the Interest of [J.M. and R.M.]*, No. 2011–31395 in the 309th District Court of Harris County, Texas, the Hon. Sherri Y. Dean, presiding.

noticed a dramatic change in Michael's demeanor and in how he treated J.M. Terri testified that, around this time, J.M. started wetting the bed and having night terrors for the first time.

Charlie testified regarding instances in which he had witnessed Michael mistreating J.M. under the guise of discipline. The first incident occurred on Easter 2010. That day, when the McDaniel family arrived at the Halls' home, Michael told Charlie that they had left Michael's grandmother's house because he had gotten into an altercation with her regarding his "intensity of discipline" of J.M. Upon their arrival at the Halls' home, Charlie saw Michael pull J.M. out of the truck and spank him approximately 10 times. Michael told Charlie that he had spanked J.M. because he had not woken up quickly enough when they arrived at the Halls' home.

Charlie was also aware of another incident that occurred shortly after Easter. Charlie testified that Michael had left a shotgun and ammunition on a picnic table. Unattended, five-year-old J.M. had loaded two shells into the shotgun. Michael responded by "grounding" J.M. Charlie spoke to Michael about the incident, informing him that it is always the adult's responsibility to secure a gun. Michael responded by telling Charlie that he would raise J.M. any way that he saw fit.

The next incident that Charlie described occurred at the rehearsal dinner before Michael and Autumn's wedding. Charlie testified that the menu included chicken that had been grilled with jalapenos. The chicken was "spicy hot" and most of the adults were not able to eat it. Charlie testified that Michael "stood over [J.M.] and forced him to eat it, although he was crying about it." Charlie and another person raised concerns regarding Michael's forcing J.M. to eat the spicy chicken.

Charlie testified that Michael told him that "he was going to raise that kid exactly how he wanted to and he didn't care what anybody said or thought. He was going to do exactly what he wanted to."

The Halls also testified about Michael's mistreatment of J.M. at their home in August 2010. According to Charlie, on Saturday August 22, 2010, J.M. and Autumn were riding four wheelers when Autumn stopped her four wheeler abruptly, resulting in J.M. rolling into the back of Autumn's four wheeler. Charlie testified that Michael "grabbed [J.M.] off the four wheeler." Charlie stated that Michael was "infuriated." "[Michael] picked [J.M.] up by one arm, had him in the air and spanked him with a level of violence I've never seen done to a small child." According to Charlie, Michael hit J.M. six or seven times. When asked how hard Michael was hitting J.M., Charlie stated, "He was hitting him so hard that he was swinging in the air." Charlie stated that Michael took J.M. into the house.

Terri testified that she was inside when Michael brought J.M. in the house. She stated that Michael was spanking J.M. Michael told Terri that J.M. was "grounded" for the remainder of the weekend. Michael explained that "grounded" meant that J.M. "had to stay in [his bedroom] . . . in bed, no books, no color books, no T.V., that J.M. just had to go to bed." Terri explained that this happened on Saturday afternoon and that her daughter's family normally stayed until Sunday afternoon. Michael instructed Terri that she should not go into J.M.'s room.

Terri testified that J.M. later asked her if he could go to the restroom. Terri stated that Autumn had told her that J.M. had been experiencing problems with wetting the bed. Terri assumed that Michael would not mind if she allowed J.M. to leave his room to go to the bathroom. However,

when he realized that Terri had permitted J.M. to go into the bathroom, Michael began banging on the door of the door of the bathroom. Terri witnessed Michael throw open the bathroom door. Terri saw that J.M. was on the floor of the bathroom "on all fours and his pants were down around his ankles." She testified that J.M. was crying and saying, "No, Daddy. No. No." Terri then testified as follows:

Michael picked [J.M.] up by the arm and he was trying to pull [J.M.'s] pants up and then got them buckled. And he took him out of the bathroom by his arm, holding him up by his arm, and he was spanking Joseph over and over and over. And every once in a while [J.M.] would hit the ground and spin around and Michael would, like, hit him sort of in the front and then in the back. And [J.M.] was crying. And Michael spanked him like that all the way down the hall.

Terri characterized Michael as being "out of control." She stated that Michael hit J.M. at least 10 times.

Terri also testified that Michael had opened the doors to the bathroom and to J.M.'s room so forcefully that the doorknobs had gone through the sheetrock on the wall. Photographs of the holes in the walls were admitted into evidence.

Charlie testified that at the dinner table that night, Michael "stood over [J.M.] while he ate every bite of his food." Michael was feeding J.M. in a manner that Charlie described as "forceful." Charlie testified that J.M. spit out a piece of gristle and was forced to eat it by Michael. Charlie told Michael that his behavior was inappropriate. Michael responded by stating that he would do what he wanted and that Charlie had no control over him.

Charlie testified that the next morning, Sunday, August 23, 2010, he noticed bruising on J.M.'s bottom in the shape of a handprint. Charlie testified that he took photographs of the bruising on J.M.'s body caused by the beating that Michael had given J.M. The trial court admitted six photographs into evidence that Charlie testified showed the bruising on J.M.

Charlie testified that he did not see Michael that Sunday morning. He stated that he took J.M. to a fast-food restaurant for breakfast. When Michael found out that he had taken J.M. for breakfast, Michael became furious and left with Autumn and the children. Michael sent Charlie a hostile text message replete with vulgarities and expletives.

Terri called CPS on August 24, 2010 to report the abuse. Terri testified that she called CPS because she hoped the agency would offer Michael and Autumn parenting classes. The Halls acknowledged that CPS could not confirm the abuse.

Terri testified that Autumn had initially agreed that Michael's discipline of J.M. had been too harsh. However, Terri testified that a couple of days later, Autumn told her mother, "Well, that's just the way that we're going to discipline those boys and I might not have been so wild if you and Dad would have just beat on me and been more strict and you guys were too easy on me." After the incident at the Halls' home, Michael refused to allow the Halls to see their grandchildren.

Terri testified that, over the next several months, she stayed in contact with Autumn. Terri stated, "Autumn and I stayed in contact, even though a lot of it was arguments.... Autumn told me to just have patience, that, you know, everything would blow over and Michael would get over it, but that it would eventually be over." During this time, Autumn also told Terri that J.M. was misbehaving in school to the point that the school counselor was involved.

Terri also testified that she noticed a change in Autumn. She stated that Autumn seemed "scared of Michael and subdued and kind of submissive." Terri expressed concern because Autumn had a history of being involved with abusive men. J.M.'s biological father had stabbed Autumn in the leg and would often give her black eyes. The Halls expressed concern that Autumn could not protect her children from Michael.

Terri and Charlie testified that Autumn allowed them to visit the children on January 12, 2012. Charlie stated that he noticed a change in J.M.'s personality. He testified that J.M. was not the energetic child that he had been. J.M. seemed "beat down, very cautious."

Michael became angry when he found out about the visit. He responded by sending an email to the Halls in which he expressed, using profanities, his anger toward them. Terri testified that Autumn sent a note to them in which she stated that "she didn't know if she was going to be able to let us see the boys again because it really upset Michael and she didn't like upsetting Michael and she feels like she betrayed Michael."

Autumn stopped communicating with her parents in April 2010.

Charlie also testified that he had concerns regarding Michael's use of the prescription drug Adderall. Charlie stated that he has been a licensed pharmacist for 32 years. He testified that Adderall is a classified under federal guidelines as a Schedule 2 drug, "meaning it is the most highly abused . . . class of drug as listed by the Drug Enforcement Administration."

Charlie stated that he is concerned about the amount of Adderall that Michael is taking. The evidence showed that Michael was prescribed a daily dosage of 100 milligrams of Adderall by his physician to treat his ADHD. Charlie testified that, for an adult, 40 milligrams a day is the maximum recommended dosage of Adderall. He stated that exceeding the maximum recommended dosage results in unpredictable side-effects and is "usually toxic to the patient."

On direct examination, Charlie was asked, "What do you personally see, if anything, in Mr. McDaniel that gives you a concern about Adderall abuse?" He answered, "The livable side effects, things that are happening to him, the insomnia, staying up all night. He was up all the time. Every time I saw him at my house he was up, 24/7 it seemed like. He's paranoid. He's upset. He's irrational." Charlie was also asked, "If Mr. McDaniel is getting the Adderall through a prescription, why do you still have a concern about 24 abuse?" He responded, "Because when I worked in behavioral health, probably 80 percent of the drug addicts we treated were on legitimate prescription drugs."

Michael and Autumn also testified at the hearing. They each acknowledged that Michael had spanked J.M. on August 22, 2010 at the Halls' home but disagreed with the Halls' characterization of the intensity of the discipline. They denied that Michael had left bruises on J.M. Autumn testified that Michael is not abusive to her or to the children. She indicated that they have a good marriage and that she is not afraid to stand up to Michael.

Michael testified that he is taking Adderall under a doctor's care. He stated that he needs to take 100 milligrams a day to be able to function properly at work.

Autumn testified that J.M. is doing well in school, and she had been the room parent in his kindergarten class. When asked how 22–month old R.M. was doing, Autumn responded, "He's great."

The McDaniels stated that they had cut off contact with the Halls because the Halls constantly undermined their parenting and disciplining of the children. Michael testified that J.M. is much better behaved when he is kept from the Halls. The McDaniels theorized that the Halls filed the lawsuit for managing conservatorship because they had learned that Michael was looking for work in another city.

After hearing the evidence, the trial court made oral pronouncements on the record. It determined that the Halls had standing to pursue their suit for managing conservatorship and denied the McDaniels' motion to dismiss. The trial court appointed the Halls temporary managing conservatorship of the children and the McDaniels temporary possessory conservators. The trial court also appointed an amicus attorney for the children. The McDaniels were ordered to deliver the children to the Halls that evening. The trial court indicated that, for the next 30 days, the McDaniels could visit the children only at the discretion of the amicus attorney. The court stated that it "was very concerned about the testimony that [it had] heard today, very." It suggested to the McDaniels that they receive counseling before the next hearing on the temporary orders. The trial signed temporary orders memorializing what it had orally pronounced.

The next hearing on the temporary orders occurred on August 19, 2011. The McDaniels requested the trial court to reconsider its denial of their motion to dismiss the Halls' claim for managing conservatorship. At the hearing, the McDaniels argued that the Halls lacked standing to pursue the conservatorship claim because they had not shown that children's present circumstances significantly impaired their physical health or emotional development.

The trial court again denied the motion to dismiss the Halls' suit.

The trial court also heard additional evidence at the hearing. Michael and Autumn each testified. They testified that they had taken online parenting and anger management classes. They had also attended a seminar concerning management of ADHD.

The McDaniels offered the testimony of the licensed social worker from whom they had taken the ADHD seminar. She testified that Michael had been properly diagnosed with ADHD and that his prescription for 100 milligrams of Adderall per day was appropriate. She disagreed with Charlie that 40 milligrams of Adderall per day is the maximum recommended dosage for an adult.

The amicus attorney recommended to the trial court that the children be returned to the McDaniels.

At the end of the hearing, the trial court reaffirmed that the Halls would remain the temporary managing conservators and rendered additional temporary orders giving the McDaniels periods of possession of the children. The trial court made the following statement on the record:

I want y'all to understand, I'm not punishing anybody. I know you feel that way. I know you do, but this strictly has to do with my concern for this child. I have yet to have any credible explanations to what happened to this child, save and except a concerned grandfather. And because of that, I have to remain concerned about this child. And that is not the only piece of information. And this was a continuation of the original temporary order that was heard on the 19th of July. I've looked at the transcript. I know what you-all said. And I heard some very disturbing testimony. And I continue to be concerned for the safety of this child. But, with that being

said, I hear grandparents that, given a little bit more time and a little bit more show of some true remorse and work to get to a better page, that they would like for you to reunite with your children. But I can't get there, not in a month and not with the things that I've heard today and with the things that I heard on the 19th of July. I can't do it.

The McDaniels now seek mandamus relief, asserting that the Halls lacked standing to file their claim for managing conservatorship. They contend that the trial court abused its discretion when it denied their motion to dismiss the Halls' original suit for managing conservatorship. The McDaniels request this Court to order the trial court to vacate the temporary orders and to sign an order dismissing the Halls' claim for managing conservatorship.

## Principles Governing Entitlement to Mandamus Relief

To be entitled to mandamus relief, a relator must meet two requirements. First, the relator must show that the trial court clearly abused its discretion. *In re Prudential Ins. Co. of America,* 148 S.W.3d 124, 135 (Tex.2004) (orig. proceeding). Second, the relator must demonstrate it has no adequate remedy by appeal. *Id.* at 136.

A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex.2005) (orig. proceeding). When reviewing the trial court's decision for an abuse of discretion, we may not substitute our judgment for that of the trial court with respect to resolution of factual issues or matters committed to the trial court's discretion. *See Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992); *see also*

*Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

Review of the trial court's determination of the legal principles controlling its ruling is much less deferential. *See Walker,* 827 S.W.2d at 840. A trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled. *Prudential,* 148 S.W.3d at 135. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker,* 827 S.W.2d at 840.

Absent extraordinary circumstances, mandamus will not issue unless the relator lacks an adequate remedy by appeal. *In re Van Waters & Rogers, Inc.,* 145 S.W.3d 203, 210–11 (Tex.2004) (orig. proceeding). Whether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of costs and benefits of interlocutory review. *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 464 (Tex.2008) (orig. proceeding).

Because temporary orders are not appealable, mandamus is an appropriate remedy when a trial court abuses its discretion in issuing temporary orders in a suit affecting the parent-child relationship. *See In re Derzapf,* 219 S.W.3d 327, 335 (Tex.2007). Similarly, an order denying a motion to dismiss for lack of standing in a suit affecting the parent-child relationship is not appealable, and mandamus relief is an appropriate remedy. *See In re Roxsane R.,* 249 S.W.3d 764, 775 (Tex.App.-Fort Worth 2008, orig. proceeding).

## Standing to File Original Suit for Managing Conservatorship

### A. Applicable Law

A party seeking conservatorship of a child must have standing to seek such relief. *Smith v. Hawkins,* No. 01–09–00060–CV, 2010 WL 3718546, at *2

(Tex.App.-Houston [1st Dist.] Sept. 23, 2010, pet. denied) (mem. op.); *In re SSJ-J*, 153 S.W.3d 132, 134 (Tex.App.-San Antonio 2004, no pet.). "Standing is implicit in the concept of subject matter jurisdiction." *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). If a party fails to establish standing, the trial court must dismiss the suit. *In re N.L.D.*, 344 S.W.3d 33, 37 (Tex.App.-Texarkana 2011, no pet.).

■■■■ A party's standing to seek relief is a question of law, which we review de novo. *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004); *In re Vogel*, 261 S.W.3d 917, 920–21 (Tex.App.-Houston [14th Dist.] 2008, orig. proceeding). In our de novo review of standing, we must take as true all evidence favorable to the challenged party and indulge every reasonable inference and resolve any doubts in the challenged party's favor. *N.L.D.*, 344 S.W.3d at 37; *In re Fountain*, No. 01–11–00198–CV, 2011 WL 1755550, at *3 (Tex.App.-Houston [1st Dist.] May 2, 2011, orig. proceeding) (mem. op. on reh'g); *Smith*, 2010 WL 3718546, at *3.

■■■■ In the context of a suit affecting the parent-child relationship, standing is governed by the Family Code, and "[t]he party seeking relief must allege and establish standing within the parameters of the language used in the statute." *Smith*, 2010 WL 3718546, at *2 (quoting *In re H.G.*, 267 S.W.3d 120, 124 (Tex.App.-San Antonio 2008, no pet.)); *accord Fountain*, 2011 WL 1755550, at *3.

The Halls allege in their petition that they have standing pursuant to section 102.004(a)(1) of the Family Code, which provides as follows:

> (a) ... [A] grandparent, or another relative of the child related within the third degree by consanguinity, may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:
>
> > (1) the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development. . . .

TEX. FAM.CODE ANN. § 102.004(a)(1) (Vernon 2008).

■■■■ When, as here, the petitioner is statutorily required to establish standing with "satisfactory proof," the evidentiary standard is a preponderance of the evidence. *In re A.M.S.*, 277 S.W.3d 92, 96 n. 4 (Tex.App.-Texarkana 2009, no pet.); *Von Behren v. Von Behren*, 800 S.W.2d 919, 921 (Tex.App.-San Antonio 1990, writ denied). The petitioner must show the facts establishing standing existed at the time suit was filed in the trial court. *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex.2001); *Vogel*, 261 S.W.3d at 921. If the petitioner fails to meet this burden, the trial court must dismiss the suit. *N.L.D.*, 344 S.W.3d at 37; *Smith*, 2010 WL 3718546, at *2.

With these principles in mind, we determine whether the trial court abused its discretion when it concluded that the Halls had standing to assert their original claim for managing conservatorship.

**B. Analysis**

■■■■ In their mandamus petition, the McDaniels assert that the Halls failed to show, by a preponderance of the evidence, that at the time their petition was filed on May 25, 2011, "the present circumstances would significantly impair [J.M.'s and R.M.'s] physical health or emotional development." The McDaniels acknowledge that the Halls offered evidence of physical abuse by Michael, but they point out that the last incident of abuse cited by the Halls was on August 22, 2010—nine

months before the Halls filed suit for managing conservatorship. The McDaniels contend that this is not evidence of the children's "present circumstances." However, the McDaniels do not discuss this evidence in the context of the record as a whole and fail to acknowledge the reasonable inferences that can be made from the record evidence.

The Halls offered evidence of two other instances of abusive conduct besides the August 22, 2010 incident. Specifically, Charlie testified in detail about Michael's mistreatment of J.M. on Easter and at the rehearsal dinner. It is accepted that a fact finder may measure a parent's future conduct by his past conduct and infer that a parent who has engaged in abusive or neglectful conduct in the past will continue this behavior in the future. *See Castorena v. Texas Dep't of Protective & Regulatory Servs.*, No. 03–02–00653–CV, 2004 WL 903906, at *10–11 (Tex.App.-Austin Apr. 29, 2004, no pet.) (mem. op.). As one court observed in a child custody decision, "Past is often prologue." *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex.App.-Waco 1992, no writ).

Such an inference is strengthened when the evidence shows, as it does here, that the present circumstances in which a child lives have not changed since the last identifiable instance of abuse. Here, the evidence shows that, on May 25, 2011, when the petition was filed, the circumstances in which J.M. and R.M. lived were no different than the circumstances in which they lived on August 23, 2010. Specifically, the evidence showed that neither Michael, nor his ideas about disciplining J.M., had changed since August 2010. On July 19, 2011, Michael testified that he had never received any type of psychological therapy or counseling. This would include the time period between August 2010 and the filing of Halls' petition on May 25, 2011.

The evidence also showed that Michael was taking the same dosage of Adderall at the time of the filing of the petition as he had been taking when the Halls witnessed the abuse. Michael testified at the July 19, 2011 hearing that he was still taking 100 milligrams of Adderall a day. Charlie, a licensed and experienced pharmacist, testified that this exceeded the maximum recommended dosage for an adult. Charlie also testified that Michael's behavior, which he observed, is consistent with the side-effects of an over-dosage of Adderall. In this regard, Charlie testified that Michael had insomnia and would stay up "24/7." Charlie observed that Michael was paranoid, upset, and irrational.

In addition, a fact finder could infer from the evidence that Michael was acting irrationally. Such an inference could be made from Michael's decision to forbid his children from seeing the Halls, with whom J.M. had a long-term close relationship. A fact finder could also infer from the messages that Michael sent to the Halls after the August 22 incident and after the Halls saw the children in January 2011 that he was prone to overreact in a hostile manner when someone upset him.

Furthermore, the record also contains additional evidence tending to show that the circumstances that existed in August 2010 also existed in May 2011. The evidence showed that the McDaniels expressly stated that Michael would continue to discipline J.M. in the same manner as he had in August 2010. Moreover, a fact finder could reasonably infer that Michael kept his children from seeing their grandparents after August 2010 because he did not want the Halls to witness or report any subsequent abuse.

█ In addition to asserting that the Halls had presented a lack of evidence, the McDaniels also point to evidence that they claim shows that present circumstances are not significantly impairing the chil-

dren's physical health or emotional development.[2] The McDaniels cite Autumn's testimony that both her children are doing well. Michael testified that J.M.'s behavior was much better after being separated from his grandparents. However, there is evidence to the contrary in the record.

Terri testified that in the months following the August 2010 incident, Autumn told her that J.M. was acting out in school to the point that the school counselor was involved. In addition, Michael agreed that J.M. "is acting out aggressively at school." Charlie also testified that when he saw him in January 2011, J.M.'s personality had changed. He stated that J.M. seemed "beat down, very cautious."

Given the evidence and the manner in which it must be viewed, we conclude that the Halls satisfied their burden to show that J.M.'s and R.M.'s present circumstances on May 25 would significantly impair their physical health or emotional development.[3]   *See* Tex. Fam.Code Ann. § 102.004(a)(1). In short, the Halls offered sufficient evidence to establish standing to file an original suit for managing conservatorship. *See id.*

### Conclusion

We hold that the trial court did not clearly abuse its discretion when it denied the McDaniel's motion to dismiss for lack of standing. Accordingly, we deny the McDaniel's petition for writ of mandamus.

---

2. The McDaniels also cite the amicus attorney's opinion regarding standing as support for their mandamus petition. At the August 19, 2011 hearing, the trial court asked the amicus attorney whether he believed that the Halls had standing to file the SAPCR. The amicus attorney opined that he thought the Halls did not have standing because the August 2010 incident was too remote in time to constitute "present circumstances." In addition, at the same hearing, the amicus attorney stated that, in his opinion, the children should be returned home immediately to the parents. The role of an amicus attorney is defined by statute. Specifically, the Family Code defines an "amicus attorney" as "an attorney appointed by the court in a suit, other than a suit filed by a governmental entity, whose role is to provide legal services necessary to assist the court in protecting a child's best interests rather than to provide legal services to the child." Tex. Fam.Code Ann § 107.001(1) (Vernon 2008). Thus, the amicus attorney's role is limited by statute to assisting the trial court with protecting the best interests of the child. *See id.; see also O'Connor v. O'Connor*, 245 S.W.3d 511, 515 (Tex.App.-Houston [1st Dist.] 2007, no pet.) (stating that trial court "is, in effect, the amicus attorney's client for a limited purpose"). While in some cases, an amicus attorney's statement on the record regarding the best interest of the child might contain

some evidence of the child's present circumstances at the time of the filing of the SAPCR, those are not the facts of this case. Here, the amicus attorney did not present any new independent facts as a result of any investigation that he did. His opinion was based on his interpretation of the evidence that was otherwise in the record and on circumstances at that point in time, which was three months after the SAPCR petition was filed by the grandparents. We emphasize: questions of standing are questions of law for the court to decide. *See El Paso Refining, Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 383 (Tex.App.-El Paso 2002, pet denied) (holding that it was error to allow jury to determine standing issue because it is a question of law for the court to decide).

3. Our discussion and final conclusions in this original proceeding should not be read to determine or influence any factual determinations to be made by the fact finder in the future in this case. *See In re Fountain*, No. 01–11–00198–CV, 2011 WL 1755550, at *1 (Tex.App.-Houston [1st Dist.] May 2, 2011, orig. proceeding) (mem. op. on reh'g). The instant proceeding pertains only to the threshold issue of standing to assert a claim for managing conservatorship. It has no bearing on the ultimate determination of the merits of the claim. *See id.*