

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-18-00839-CV

**IN RE JAMES** and Wendy **SCHICK**

Original Mandamus Proceeding[1]

Opinion by:      Rebeca C. Martinez, Justice

Sitting:      Sandee Bryan Marion, Chief Justice
             Rebeca C. Martinez, Justice
             Irene Rios, Justice

Delivered and Filed: December 19, 2018

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

Relators James and Wendy Schick assert the trial court abused its discretion by removing the child from their care and placing the child with Dan and Rosario York, the real parties in interest because the Yorks lack standing. Relators also assert the trial court abused its discretion by modifying temporary orders without notice or an adversarial hearing. Because we agree, we conditionally grant the petition for writ of mandamus.

## PROCEDURAL BACKGROUND

The child the subject of this suit was born in April 2017. On May 3, 2017, the Texas Department of Family and Protective Services ("the Department") filed suit to terminate the parent-child relationship. On May 16, 2017, the trial court signed temporary orders naming the

---

[1] This proceeding arises out of Cause No. 2017-PA-00946, styled *In the Interest of D.M.B., a Child*, pending in the 150th Judicial District Court, Bexar County, Texas, the Honorable Martha Tanner presiding.

Department temporary managing conservator of the child. In July 2017, the Department placed the child with relators, who are the foster parents. The child lived with relators for the next fifteen months.

On April 2, 2018, just before the child's first birthday, Dan and Rosario York traveled from Michigan to meet the child for the first time and to visit for about one hour. On April 9, 2018, the child's mother filed a Motion to Authorize Placement of the Children, requesting that the child be placed in the home of Dan and Rosario York.[2] On May 3, the child's mother and alleged biological father executed affidavits of voluntary relinquishment, naming the Department as the child's managing conservator. On July 16, 2018, relators filed a petition in intervention seeking termination of parental rights and to adopt the child. The Yorks participated in Skype calls with the child about every week until July 31, 2018.[3] The Yorks also visited with the child two other times on July 31 and August 2, 2018 for about an hour to an hour and a half.

The case was set for trial on the merits of termination and adoption on September 26, 2018. On September 21, 2018, the Yorks, including Dan York's sister Luann York, the child's maternal grandmother from Maine, filed a joint petition in intervention alleging standing under section 102.004(b) of the Texas Family Code.[4] In their petition, the Yorks asked to be appointed the child's joint managing conservators alleging that appointment of one or both parents as sole or joint managing conservators would significantly impair the child's physical health or emotional development. After the Department verbally objected to the Yorks' standing to appear at trial, the

---

[2] The motion further alleged that the Department and father Douglas Baker supported the placement of the child with the York couple.

[3] On July 31, 2018, Judge Paul Canales, after hearing evidence including the testimony of Dan York, denied the Motion to Authorize Placement of the Children with the York couple.

[4] In their Petition in Intervention, Dan York alleged to be the child's maternal uncle, and Luann York alleged to be the child's maternal grandmother. Dan York testified that Luann was his sister. The record reflects Dan York is the maternal great-uncle.

court referred the matter of standing for hearing by the Presiding Court on October 11, 2018 and commenced trial on the merits, hearing brief testimony from the caseworker before recessing trial until October 22, 2018.

The Department subsequently filed a formal motion to strike and relators filed a plea to the jurisdiction and motion to strike, each arguing the Yorks lacked standing and their intervention was not timely. The matter was re-assigned to Judge Tanner, and trial resumed on October 23, 2018. At the Department's request, Judge Tanner permitted the Yorks to first present evidence on the issue of their standing. The court heard testimony from the Department caseworker and supervisor, as well as from Dan York. The next day, the Yorks rested and the court heard argument from counsel on their respective motions to strike the Yorks' intervention. The trial court then stated it would hold the motions to strike in abeyance, suspended the trial and sua sponte stated it would enter "some emergency temporary orders." Relators' attorney objected that he had not yet put on his case on the merits, to which the trial court responded, "That's why I'm doing emergency temporary orders."

On October 25, 2018, the trial court signed an "Emergency Temporary Order and Order Authorizing Placement of a Child" ("the emergency temporary orders"). In the emergency temporary orders, the trial court found it had "jurisdiction of this case and of all parties, *at this time*." [Emphasis added.] The emergency temporary orders held the motions to strike in abeyance, and modified conservatorship by granting only Dan and Rosario York certain rights, privileges, duties, and powers as temporary managing conservators of the child, with possessory rights to relators every other weekend beginning November 9, 2018.[5] On November 6, 2018, the trial court signed an order denying the motions to strike.

---

[5] Intervenor Luann York, the alleged maternal grandmother, received no relief in the emergency temporary orders. Luann York is not a party to this mandamus proceeding.

Relators filed a petition for writ of mandamus arguing (1) the trial court's emergency temporary order is void because the Yorks do not have standing, (2) the trial court improperly modified temporary orders without notice and a full adversarial hearing, and (3) the trial court modified temporary orders without any evidentiary basis for doing so. The Yorks filed a response, and the Department and the child's ad litem filed responses in support of relators' position.

## ENTITLEMENT TO MANDAMUS RELIEF

Mandamus is an extraordinary remedy. *In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding). Mandamus will issue only to correct a clear abuse of discretion when there is no other adequate remedy at law. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding). To satisfy the clear abuse of discretion standard, the relator must show "that the trial court could reasonably have reached only one decision." *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 630 (Tex. 1996) (orig. proceeding) (quoting *Walker*, 827 S.W.2d at 840). The relator has the burden of establishing both prerequisites to mandamus relief, and this burden is a heavy one. *In re CSX Corp.*, 124 S.W.3d 149, 151 (Tex. 2003) (orig. proceeding) (per curiam).

Because temporary orders are not appealable, mandamus is an appropriate remedy when a trial court abuses its discretion in issuing temporary orders in a suit affecting the parent-child relationship. *See In re Derzapf*, 219 S.W.3d 327, 335 (Tex. 2007) (orig. proceeding) (per curiam). An order denying a motion to dismiss for lack of standing in a suit affecting the parent-child relationship is not appealable; therefore, mandamus relief is an appropriate remedy. *In re McDaniel*, 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding).

## STANDING

Standing is a component of subject matter jurisdiction, and any judicial action by a court without jurisdiction is void. *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet.

denied). "'Without standing, a court lacks subject matter jurisdiction' over the case, and the merits of the plaintiff's claims thus cannot be litigated or decided." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018) (considering whether grandparent had standing to file SAPCR seeking conservatorship of child). "When standing has been conferred by statute, the statute itself should serve as the proper framework for a standing analysis." *In re K.D.H.*, 426 S.W.3d 879, 883 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

"The Texas Legislature has provided a comprehensive statutory framework for standing in the context of suits involving the parent-child relationship." *H.G.*, 267 S.W.3d at 124. "A party seeking conservatorship of a child must have standing to seek such relief." *In re McDaniel*, 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding). "In the context of a [SAPCR], standing is governed by the Family Code, and '[t]he party seeking relief must allege and establish standing within the parameters of the language used in the statute.'" *Id.* at 397 (citations omitted); *see also H.G.*, 267 S.W.3d at 124 (holding same).

Because the Yorks' petition in intervention asked the trial court to appoint them joint managing conservators of the child, they were required to show standing to intervene pursuant to Family Code section 102.004. Their petition alleged each had standing under section 102.004(b), and, in their response to the petition for writ of mandamus, the York couple further argue their standing is also achieved under section 102.004(a) (tried by consent).

## A.   Standing of "Other Person" Under Section 102.004(a)

The York couple argue that because the child's biological parents consented to their intervention seeking managing conservatorship, they automatically have standing under section 102.004(a)(2). We disagree.

Subsection (a) provides as follows:

(a) In addition to the general standing to file suit provided by Section 102.003, a grandparent, or another relative of the child related within the third degree by consanguinity, may file an original suit requesting managing conservatorship if there is satisfactory proof to the court that:
(1) the order requested is necessary because the child's present circumstances would significantly impair the child's physical health or emotional development; or
(2) both parents, the surviving parent, or the managing conservator or custodian either filed the petition or consented to the suit.

TEX. FAM. CODE § 102.004(a).

Subsection (a) applies to the filing of an "original suit," which the Yorks did not do. Instead, the Yorks sought intervention in a pending suit filed by the Department. The York couple argue in their petition that both parents of the child consented to their intervention seeking conservatorship, as evidenced by their testimony at the hearing; however, the Yorks' argument ignores a threshold requirement under subsection (a)—that either Dan or Rosario York, who is "another relative," be "related [to the child] within the third degree by consanguinity." Because the record reflects that Dan York is the child's great-uncle, he is not related within the third degree by consanguinity. *See* TEX. GOV'T CODE § 573.023(b) ("Computation of Degree of Consanguinity"); *see also In re N.L.D.*, 344 S.W.3d 33, 38 (Tex. App.—Texarkana 2011, no pet.) ("Pursuant to their own pleadings and testimony, Jimmy and Angela are N.L.D.'s great-uncle and great-aunt, and are, therefore, not related to N.L.D. within three degrees of consanguinity. Accordingly, they do lack the requisite standing . . ..").

Subsection (a), therefore, does not apply here. Therefore, we address whether the York couple established standing as pled under section 102.004(b).

## B.      Standing of "Other Person" Under Section 102.004(b)

Under the Texas Family Code, a "court may grant [an] other person, . . . deemed by the court to have had substantial past contact with the child leave to intervene in a pending suit filed

- 6 -

by a person authorized to do so under this chapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development." TEX. FAM. CODE. § 102.004(b).

When a party is statutorily required to establish standing with "satisfactory proof," the applicable evidentiary standard is by a preponderance of the evidence. *In re Tinker*, 549 S.W.3d 747, 751 (Tex. App.—Waco 2017, orig. proceeding). "The burden of proof is on the party asserting standing, and the petitioner must show that the facts establishing standing existed at the time the petition was filed in the trial court." *Mauldin v. Clements*, 428 S.W.3d 247, 263 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also In re Chester*, 398 S.W.3d 795, 800 (Tex. App.—San Antonio 2011, orig. proceeding) ("We review the 'present circumstances' of the child [under section 102.004(a)(1)] as they existed at the time the intervention was filed."). "If the petitioner fails to meet this burden, the trial court must dismiss the suit." *McDaniel*, 408 S.W.3d at 397. Because the Yorks filed their initial Petition in Intervention on September 21, 2018, their standing to intervene is measured at that time.[6]

## 1.    Substantial Past Contact

The "substantial past contact" standard is not defined by statute or caselaw. *In re C.M.C.*, 192 S.W.3d 866, 871 (Tex. App.—Texarkana 2006, no pet.). "'Substantial' is defined generally as 'of ample or considerable amount, quantity, size, etc.'" *Id.* at 872 (quoting 747, RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1897 (2nd ed. 1987); *Tinker*, 549 S.W.3d at 752 (same).

---

[6] The Yorks contend standing to file an intervention is a fact issue that is to be determined by the trial court; therefore, mandamus is not available because this court may not resolve disputed areas of fact in a mandamus proceeding. Whether a party has standing to pursue a cause of action is a question of law that we review de novo. *H.S.*, 550 S.W.3d at 155; *In re SSJ-J*, 153 S.W.3d 132, 134 (Tex. App.—San Antonio 2004, no pet.). In this case, the facts relevant to the Yorks' contact with the child are not in dispute. Accordingly, we determine whether the trial court properly applied the law to the undisputed facts.

Our inquiry is fact-intensive and should focus on the amount of actual contact the child had with the adult. *C.M.C.*, 192 S.W.3d at 871-72; *Tinker*, 549 S.W.3d at 751; *see also Chavez v. Chavez*, 148 S.W.3d 449, 456 (Tex. App.—El Paso 2004, no pet.) (grandparents had standing to intervene when children lived with them for over a year); *In re A.M.*, 60 S.W.3d 166, 169 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (foster parents had standing when seventeen-month-old child resided with them for fourteen months); *In re M.T.*, 21 S.W.3d 925, 927 (Tex. App.—Beaumont 2000, no pet.) (foster parents had standing to intervene after children lived with them for fourteen months); *In re Hidalgo*, 938 S.W.2d 492, 495 (Tex. App.—Texarkana 1996, no writ) (step-grandmother had standing to file petition for managing conservator when she and child were close since child's birth and child resided with her).

### 2.    Analysis

Robert Rangel, the department caseworker, testified the child was removed from the parents in late April 2017 when the child was seven days old. The Department was named managing conservator in May 2017 and the child was placed with relators. Rangel testified the Yorks expressed an interest in having the child in June 2017. Mr. York had two one-hour in-person visits with the child in April 2018 and a ninety-minute visit in July 2018. Mr. and Mrs. York had weekly thirty-minute Skype telephone calls beginning in April 2018. However, Rangel testified that in July 2018, after he consulted with the child's ad litem, he told relators they no longer were required to allow Skype contact with the Yorks because the child was a nonverbal infant and relators were not comfortable engaging in conversations with the Yorks. Rangel stated he did not believe one could "bond with a child through video conferencing." Rangel stated that if the Yorks came to Texas, he would provide them with in-person visits and he encouraged them to visit more often.

Rangel stated that at some point in the case, placing the child with Mr. York was a goal. However, that did not happen because there were discrepancies with him being licensed as a foster parent in Michigan. At this point in the testimony, the Department's attorney objected that testimony about licensing was irrelevant to the issue of substantial past contact and that Rangel testified he offered the Yorks contact. The Yorks' attorney replied, "I would argue that it is relevant because if the contact was prevented by the Department's actions and misrepresentations, you can't reward [the Department] for having dirty hands. It is all relevant." The trial court overruled the Department's objection. Much of the remaining questions asked of Rangel focused on Mr. York being licensed in Michigan to be a foster parent pursuant to the Interstate Compact on the Placement of Children ("ICPC"), the delays in getting necessary paperwork filed with the Department in Texas, and termination of parental rights versus reunification with the biological parents.

Bobby Fears, a Department supervisor who took over the case in November 2017, also testified about the ICPC licensing issue and various delays, whether on the part of the Department or the Yorks themselves. Fears stated that before November 2017 the case "probably did" fall "through the cracks with the Department." Fears stated Mr. York told him that he [Mr. York] knew in June 2017 that he had to be licensed. However, Fears said another factor in any delay in placing the child with the Yorks was that the biological parents kept changing their minds about where they wanted the child placed—to work services and be reunited with their child, place the child with the Yorks, or leave the child with the foster family. Fears said he conveyed to Mr. York his concerns about the lack of a relationship between Mr. York and the child and he encouraged Mr. York to visit the child. Fears said Mr. York's reasons for not visiting were his work schedule, the distance to travel, and the expense of travel. Fears did not believe the Skype calls were

effective because the conversations were mostly between the Yorks and relators after the child lost interest.

Mr. York also testified about the ICPC issue, what the Department allegedly did or did not do, and, in large part, his attorney asked him questions relevant to the ICPC issue and questions relevant to the ultimate placement of the child and the *Holley* factors. As to his contact with the child, he stated he had only three in-person visits with the child, but he denied the Department encouraged him to visit. He further testified that the child interacted with him and his wife during the Skype calls.

The foster father testified that, although he knew of an "uncle" with whom the child could be placed, he had never met Mr. York until a hearing in April 2018. Before that hearing, the Yorks never made any telephone calls, asked for photos of the child, or showed any interest in the child's development or "[w]ho she was, what she looked like, [or] how she behaved." The foster father testified most of the Skype calls were spent discussing the child's doctor visits, physical therapy, and then "small talk."

Following the foster father's testimony, the Yorks' attorney rested and the Department and relators' attorneys re-urged their motions to strike on the ground that the Yorks provided no evidence of substantial past contact with the child. The child's ad litem agreed with the Department and relators. After hearing closing arguments, the trial court sua sponte stated it would enter "some emergency temporary orders" and hold in abeyance any ruling on the motions to strike. The trial court then stated

> . . . I hold the Department's actions solely responsible for this, and for the heartbreak it's going to cause, but I'm going to order that the child go to Michigan, and that the foster parents and the Department may go, may go, every two weeks to check on and see the child and keep the bonds going.

Relators' attorney objected that he had not yet put on relators' case. Nevertheless, the trial court ordered the child turned over to the Yorks that day (October 25) by 4:00 p.m. On that same day, the trial court signed the emergency temporary orders. On November 6, 2018, the trial court signed an order denying the motions to strike.

In their petition, relators assert the Yorks' limited contact with the child does not satisfy the statutory standard necessary to establish standing. We agree with relators that the Yorks did not show they had "substantial past contact" with the child.

In *C.M.C.*, the maternal grandparents exchanged correspondence and monthly telephone calls with the children. Specifically, they sent gifts and cards for various occasions and holidays. The appellate court concluded that "[w]hile the [maternal grandparents] may well have done the best they could in maintaining contact with their grandchildren, the fact remains that the actual contact was extremely minimal." 192 S.W.3d at 872. The court noted "[m]ost of this correspondence could be more fairly characterized as contact with the mother rather than contact with the children, particularly considering the ages of the children[,]" who were four years old and less than two years old. *Id.* The grandparents had only physically met their older grandchild on two occasions and had never seen their younger grandchild. The appellate court held that, although the grandparents may have done the best they could in maintaining contact, "[u]nder any conceivable definition of 'substantial past contact,' the [grandparents] lack substantial contact with the children." *Id.*

Here, the Yorks filed their petition in intervention on September 21, 2018. Before that date, the Yorks had three in-person visits with the child, each visit lasting an hour to an hour and a half. Mr. and Mrs. York also had weekly thirty-minute Skype telephone calls from April 2018 to July 2018. On this record, we must conclude the Yorks did not show substantial past contact

sufficient to confer standing; therefore, the trial court erred in denying the motions to strike the intervention.

### 3. "Equitable" Standing

Whether the Yorks have standing must be determined under the Texas Family Code. *See H.G.*, 267 S.W.3d at 124. "[O]ur inquiry should be focused on the amount of actual contact which occurred, rather than the difficulties encountered in maintaining contact." *C.M.C.*, 192 S.W.3d at 871-72; *see also Tinker*, 549 S.W.3d at 751 (holding same and citing to *C.M.C.*); *see also In re S.L.M.*, 04-07-00566-CV, 2008 WL 2434160, at *2 (Tex. App.—San Antonio June 18, 2008, pet. denied) (mem. op.) (court of appeals disagreed with appellants' argument that "the actions by [the adoptive parents] in preventing them from having substantial past contact with S.L.M. establishes equitable standing"). Accordingly, the Yorks cannot establish equitable standing. *S.L.M.*, 2008 WL 2434160, at *2 (holding same); *see also In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("However, there is no good-faith requirement in the rules on standing or intervention."); *H.G.*, 267 S.W.3d at 124-25 ("while equity may estop a party from relying on a mere statutory bar to recovery, it cannot confer jurisdiction where none exists").

Although the Yorks may have encountered difficulties establishing contact with the child, our focus must be on the statutory test, which is whether the Yorks established that their standing existed at the time they filed their petition in intervention. Because we have concluded they did not do so and because equity cannot be used to confer jurisdiction, the trial court erred in denying the motions to strike the intervention.

### NOTICE AND HEARING

Relators also assert the trial court abused its discretion by entering the emergency temporary orders without notice or an adversarial hearing. Because we have determined the trial

court erred in denying the motions to strike and plea to the jurisdiction, we need not address this issue.

## CONCLUSION

For the reasons stated above, we conclude the trial court erred in allowing the Yorks to intervene; therefore, the trial court's emergency temporary orders are void. We conditionally grant relators' petition for writ of mandamus and order the trial court to (A) vacate its (1) October 25, 2018 "Emergency Temporary Orders Authorizing Placement of a Child" and (2) November 6, 2018 "Order Denying Motions to Strike," (B) grant the Department's and relators' motions to strike and plea to the jurisdiction, and (C) dismiss the Yorks' petition in intervention for lack of jurisdiction. The writ of mandamus will issue only if the trial court fails to comply within fifteen days from the date of our opinion and order.

Rebeca C. Martinez, Justice