

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-21-00259-CV

IN RE B.A.B., RELATOR

ORIGINAL PROCEEDING

May 26, 2022

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

In this original proceeding, Relator, B.A.B. (Father), seeks a writ of mandamus ordering Respondent, the Honorable Ana Estevez, judge of the 251st District Court of Randall County, Texas, to vacate an order finding that Real Parties in Interest, "Linda Ross" and husband "Warren Ross," have standing to seek conservatorship and possession of Father's minor daughter, "Allison,"[1] or alternatively to set aside temporary orders granting the Rosses conservatorship and possession of Allison. For the reasons discussed below, we conditionally grant Father's petition.

---

[1] Relator, real parties in interest, and the child are identified fictitiously or by initials. *See* TEX. FAM. CODE ANN. § 109.002(d).

**Background**

Allison was born in August 2015. In a 2016 suit affecting parent child relationship (SAPCR), Father and Mother were appointed joint managing conservators of Allison. Mother was designated the conservator with the exclusive right to designate Allison's primary residence without geographic restriction, and Father was granted periods of possession. Mother lived in Amarillo, while Father resides with his parents in the Houston area.

Mother died on March 10, 2021. Eight days later, the Rosses filed their original petition in intervention in the existing SAPCR, alleging Allison had resided with them since birth. They requested conservatorship and possession with the exclusive right to designate Allison's primary residence.

Father responded to the Rosses' original petition with a motion to dismiss, alleging a lack of standing. In an attached supporting affidavit, Father averred Warren was Allison's step-grandfather. He further stated that the intervenors' allegation of Allison's residence with them since birth was "entirely false." Father alleged he had a "standard possession order" and that Mother had "maintained [Allison's] permanent residence." Regarding the time period before Mother's death, Father alleged Allison was in his possession for about one month during the summer of 2020, was with Mother during September 2020 when Mother and Allison visited relatives in Lubbock, and remained with Mother in December 2020. Father alleged that from December 28, 2020, until January 3, 2021, Allison visited Father in the Houston area. Father said he returned Allison to Mother's residence at the end of that period. Attached to Father's affidavit were several

date-stamped photographs spanning the period August 2015 until August 2020 that depicted him with Allison, two of which showed landmarks in Fort Bend and Houston in the background.

In an amended petition filed on April 8, 2020, just before commencement of the trial court's hearing, the Rosses alleged they had "continuous possession" of Allison since September 1, 2020, with limited access by Mother on Friday nights, "due to her issues of sobriety." The Rosses also alleged, "[Mother and Father], the parents of the child, have voluntarily relinquished actual care, control and possession of [Allison] to [the Rosses] for a period of one year or more, a portion of which was within ninety days preceding the date of intervention in or filing of the suit."[2] These allegations were not tested by special exception or other pleading.

At the Zoom-based hearing on Father's motion to dismiss and the Rosses' request for temporary orders, Linda testified that Mother agreed Allison would live with the Rosses during most of the week, while Mother would keep Allison from Friday until Saturday night. Linda intimated this arrangement was made around Allison's school schedule, permitted the Rosses to take Allison to church, and permitted them to get Allison "ready and in bed" on Sunday nights. Linda testified Allison had stayed with her consistently since September 2020. The Rosses also placed Allison in grief counseling and therapy for a speech disorder.

---

[2] This language tracks Family Code section 153.373. However, the pre-suit reference also potentially invokes Family Code section 102.003(a)(9) as the basis for standing (providing standing to file an original suit for "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition."). At oral argument, the Rosses conceded their amended pleading abandoned their prior allegation that sought to prove standing under Family Code section 102.004(a).

During the hearing, the trial court told intervenors' counsel to "speed it up" and that they were running out of time. Following an objection to a portion of Linda's testimony, the attorneys pivoted to making arguments about whether the Rosses possessed standing. The trial court then ruled from the bench that the Rosses had standing to intervene. Father was denied the opportunity to present evidence, but he never objected to this denial or made an offer of proof of his intended evidence.

Once the Rosses' standing had been determined, the trial court then proceeded to hear evidence regarding the Rosses' request for temporary orders. The first person to testify was Department of Child Protective Services employee Katrina Sledge. Sledge testified about a June 2019 investigation into allegations of excessive alcohol use and emotional/mental health issues of Mother. Thereafter, Allison and another child were placed with the Rosses. Sledge noted that Father initially did not take action to intervene. Near Thanksgiving 2019, Father temporarily relocated near Amarillo to be closer to Mother and Allison and to provide assistance. At some point, the Department had a "conversation" with Father wherein they reported that although alcohol was "not his particular problem" and the Department "[wasn't] involved because of his issue," bringing alcohol into the home could cause Mother to relapse. In the third week of December, Father returned to Houston. When Mother regained sobriety, CPS closed its case.

Investigator Maria Chacon next testified about new allegations of Mother's alcohol abuse in what appears to be March 2020. Chacon spoke with Father, who replied he had held concerns about Mother's alcohol use for years. Chacon revealed at least one person

had alleged Father also "had a history with alcohol use," which Father denied.[3]  Father asked the Department to remove Allison from Mother.  Chacon acknowledged possessing no knowledge or reason why Allison could not be left alone with Father.  Chacon said she had never seen Father with the child and had no knowledge about Father's involvement in Allison's life, including about the time they "spent together or what their relationship is like."

Linda then re-took the stand.  She expressed concern that Father "is still going back and forth" with alcohol and lives with his parents.  She opined Father is "just now developing a bond" with Allison and that "yanking her away from her life" is going to set the child back.  Whereupon the trial court ruled from the bench:

> [W]e are going to keep the child where the child is right now; have a joint managing conservatorship; and we are going to move toward [Father] being the person to determine the primary residence.  He needs to get that relationship and he needs to step up. . . .
>
> But we are not doing that drastically.  We are not doing that until we are fully bonded.

The trial court signed temporary orders on July 14, 2021, appointing *inter alia,* Linda, Warren, and Father joint managing conservators and granting the Rosses the exclusive right to designate Allison's primary residence without geographic restriction.  The July 14 temporary orders were supplemented in part by amended temporary orders concerning

---

[3] Chacon later agreed she believed Father's dismissal of his alleged history with alcohol was logical given that she possessed no personal knowledge Father was, in fact, using alcohol at the time.  In a colloquy with the trial court, however, Father said he was attending multiple Alcoholic Anonymous meetings per day.  His counsel also indicated Father had a "slipup" with marijuana use three weeks before the hearing.

possession and access, signed October 18, 2021. Findings of fact and conclusions of law were neither requested nor filed.

## Standards

Mandamus is an extraordinary remedy, *In re Sw. Bell Tel. Co.,* 235 S.W.3d 619, 623 (Tex. 2007) (orig. proceeding), and ordinarily issues only to correct a clear abuse of discretion when there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding). In cases where a parent is ordered to divide possessory rights with a nonparent, an original proceeding to pursue a writ of mandamus may be initiated to challenge the standing of the nonparent. *In re Crumbley,* 404 S.W.3d 156, 159 (Tex. App.—Texarkana 2013, orig. proceeding); *In re McDaniel,* 408 S.W.3d 389, 396 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding). Moreover, original proceedings are the appropriate means of challenging temporary orders rendered in a SAPCR. *In re C.J.C.,* 603 S.W.3d 804, 811 (Tex. 2020) (orig. proceeding) (mandamus relief available where trial court's temporary order divests fit parent of possession of child because divestiture is irremediable).

Application of the abuse of discretion standard depends on the circumstances. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. *In re Olshan Found. Repair Co.,* 328 S.W.3d 883, 888 (Tex. 2010) (orig. proceeding); *Walker,* 827 S.W.2d at 839. In determining whether the trial court abused its discretion with respect to its resolution of factual issues, we may not substitute our

judgment for the trial court's and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding). This means we cannot set aside the trial court's finding unless it is clear from the record that the court could have reached only one decision. *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding). Review of the trial court's determination of controlling legal principles is much less deferential, *Walker,* 827 S.W.2d at 840, because a trial court has no discretion for determining the law or applying the law to the facts presented. *In re Clay,* No. 02-18-00404-CV, 2019 Tex. App. LEXIS 991, at *6-7 (Tex. App.—Fort Worth Feb. 12, 2019, orig. proceeding [mand. denied]) (mem. op.) (citing *In re Prudential Ins. Co.,* 148 S.W.3d at 135).

Legal and factual evidentiary insufficiency are not independent grounds of error, but are instead relevant factors to assess whether the trial court abused its discretion. *Henry v. Henry,* 48 S.W.3d 468, 475 (Tex. App.—Houston [14th Dist.] 2001, no pet.). In assessing the legal sufficiency of evidence, we credit evidence that supports the finding if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* To determine whether evidence is factually sufficient, we examine all the record evidence in a neutral light and will reverse only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding should be set aside and a new trial ordered. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner,* 505 S.W.3d 580, 615 (Tex. 2016).

Analysis

Do the Rosses have standing to intervene?

In his first issue, Father argues the trial court clearly abused its discretion by finding the Rosses had standing to intervene in the underlying SAPCR. A party seeking conservatorship must have standing to seek such relief. *In re Tinker*, 549 S.W.3d 747, 750 (Tex. App.—Waco 2017, orig. proceeding). Because the Texas Family Code defines who has standing in SAPCRs, it guides the evidence that must be presented. *In re S.M.D.*, 329 S.W.3d 8, 12 (Tex. App.—San Antonio 2010, pet. dism'd). Standing is simply the right to be heard; it does not determine who will prevail on the merits. *In re S.S.J.-J.,* 153 S.W.3d 132, 138 (Tex. App.—San Antonio 2004, no pet.).

As noted above, the Rosses' sole alleged basis for their standing to intervene depends on Family Code section 102.003(a)(9). That section recognizes standing for "a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." TEX. FAM. CODE ANN. § 102.003(a)(9). Typically, a pleading that alleges the petitioning party satisfies section 102.003 is sufficient unless a party challenges standing and submits evidence showing the non-existence of a necessary fact. *Id.* If that occurs, "the petitioner must submit evidence raising a fact issue on the challenged elements to avoid a dismissal for lack of standing." *Id. See also In re G.H.,* No. 02-14-00261-CV, 2015 Tex. App. LEXIS 6223, at *7 (Tex. App.—Fort Worth June 18, 2015, no pet.) (en banc) (mem op. on reconsideration) (stating standard for establishing standing in SAPCR when section 102.003(a)(9) is alleged).

8

The Supreme Court of Texas, in *In re H.S.,* has explained that under section 102.003(a)(9), a nonparent has "actual care, control, and possession of the child" if, for the required six-month period the nonparent occupied a parent-like role by "(1) sharing a principal residence with the child, (2) providing for the child's daily physical and psychological needs, and (3) exercising guidance, governance and direction similar to that typically exercised on a day-to-day basis by parents with children." *In re H.S.,* 550 S.W.3d at 160. There is no requirement that the nonparents' care and control be exclusive. *Id.* at 158. The high court offered some non-exhaustive examples of what constitutes "actual care"—"When a nonparent takes daily responsibility for ensuring that a child is fed, clothed, and emotionally nurtured, that nonparent is taking 'actual care' of the child." Likewise, "[w]hen a nonparent consistently makes the kinds of day-to-day decisions associated with raising a child—when she gets up and goes to bed, how much television she watches, whether she gets dessert, when she needs to go to the doctor— that nonparent is exercising 'actual control' over the child." *Id.*

While Father's affidavit contests the continuity of the Rosses' time of possession of Allison, we find that sufficient evidence supports each element required by TEX. FAM. CODE ANN. § 102.003(b). Even though the available proof is thin, we find sufficient evidence and reasonable inferences would support the trial court's ability to conclude that (1) the Rosses shared a principal residence with Allison, (2) provided for Allison's daily physical and psychological needs, and (3) exercised guidance, governance and direction for Allison during the six months immediately prior to their suit in intervention. Linda's testimony shows that beginning on September 1, 2021, or perhaps earlier, the Rosses began to care for Allison in their home in a parent-like role. Mother still had a role on

9

Friday until Saturday night, but the evidence shows that Allison's remaining time was under the direction of the Rosses. Linda's testimony allowed the trial court to reasonably infer that this schedule permitted the Rosses to care for Allison during her school schedule and for attending church with the Rosses. This six-year-old child was not left to make decisions on her own; the Rosses, for example, undertook the responsibility of getting Allison "ready and in bed" on Sunday nights, indicating they were preparing for her school attendance. She remained under their control during the other days when she had school. The Rosses also provided for the child's physical and psychological needs, placing Allison in grief counseling and in therapy for a speech disorder.

We acknowledge that the Rosses would have better assisted the trial court (and this Court) if they had detailed who fed, clothed, and emotionally nurtured Allison, and if they had evidenced who made the day-to-day decisions involving Allison's life. We find from the record and the reasonable inferences we are to credit in favor of the factfinder, however, that sufficient evidence supports a conclusion that all of those responsibilities were being fulfilled by the Rosses. We therefore conclude the trial court did not abuse its discretion in concluding the Rosses possessed standing to intervene.

Conservatorship and Possession

By his second and third issues, Father argues there was insufficient evidence to overcome the presumption that he is a fit parent. We agree.

As noted, Mother and Father were appointed Allison's joint managing conservators in 2016. As parents, Mother and Father possessed a fundamental right protected by the United States Constitution "to make decisions concerning the care, custody, and control

10

of their children." *Troxel v. Granville,* 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). This stems from "a strong tradition of parental concern for the nurture and upbringing of their children." *Id.* at 811 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972)). To maintain the sanctity of a parent's constitutional right to make child-rearing decisions, a plurality in *Troxel* applied "a presumption that fit parents act in the best interest of their children." *In re C.J.C.,* 603 S.W.3d at 807 (citing *Troxel,* 530 U.S. at 69 (plurality opinion)).

This "fit parent" presumption was formally recognized by the Supreme Court of Texas in 2020. *In re C.J.C.*, 603 S.W.3d at 807 (recognizing "[t]he presumption that the best interest of the child is served by awarding custody to [a] parent is deeply embedded in Texas law."). Accordingly, "when nonparents seek court-ordered custody of a child subject to an existing order, under which one or both fit parents were appointed managing conservators, that parent or parents retain the presumption that protects their fundamental right to determine their child's best interest." *Id.* at 819. The state's high court added a finer point to its discussion: "The government may not infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a better decision could be made." *Id.* at 807.

We find *In re C.J.C.'s* instruction to be clear: even though the Rosses possess standing to intervene and to seek an order granting them conservatorship and possession, the trial court cannot supplant Father's fundamental rights to make child rearing decisions for Alison simply because the court believes the Rosses would be a better choice. *Id.* Instead, the Rosses were required to present sufficient evidence to overcome the presumption that Father is a fit parent.

11

The Rosses alleged in their amended pleading that Mother and Father "voluntarily relinquished actual care, control and possession of [Allison] to [the Rosses] for a period of one year or more a portion of which was within ninety days preceding the date of intervention in or filing of the suit." This allegation tracks the language of Family Code section 153.373 providing that the parental presumption is rebutted if the trial court finds this has occurred. Here, however, the record does not show that Father voluntarily relinquished his care, control, or possession for the requisite time-period. The Rosses therefore failed to present evidence satisfying the requirements of section 153.373.

Other evidence, in fact, confirms the Rosses' belief that Father is a fit parent, but that he and Allison need more time for bonding. Consistent with their counsel's argument that the Rosses "want [Father] to be in this child's life. They want him to be able to be her dad," Linda indicated an intent to allow Father to live with the Rosses "so that he can develop a relationship with [Allison] and a bond and know how to parent with her disability; and then slowly move himself out with [Allison]." Similarly, the trial court's decision was based on encouraging Father to "step up" to bonding with Allison, and "we are going to move toward he being the person to determine the primary residence."

In their brief, the Rosses argue the fit-parent presumption was rebutted with evidence that Father did not contact the Department when he learned it was again investigating Mother for alcohol abuse, and that Father's attendance at Alcoholics Anonymous meetings demonstrated his own addiction. However, the Rosses did not allege grounds, nor did they offer any evidence intended to rebut the presumption that Father acts in Allison's best interest. Moreover, Respondent did not make a finding that Father was an unfit parent. We therefore conclude the evidence was legally insufficient

to support Respondent's appointment of the Rosses as Allison's temporary joint managing conservators. Accordingly, the trial court abused its discretion by signing the temporary orders of July 14, 2021 and October 18, 2021, which temporarily divests Father of some of his parental rights for Allison.

## Conclusion

Having concluded Respondent abused its discretion in the manner stated, we conditionally grant Relator's petition. Respondent is directed to vacate its temporary orders of July 14, 2021 and October 18, 2021. We are confident Respondent will comply, and our writ will issue only if Respondent fails to comply within fifteen days of this opinion and judgment.

Lawrence M. Doss
Justice