In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00292-CV

_____

IN THE INTEREST OF J.W.W.

On Appeal from the 411th District Court
San Jacinto County, Texas
Trial Cause No. CV16,837

## MEMORANDUM OPINION

This case began when the Texas Department of Family and Protective Services ("the Department") removed the minor child "Justin" from L.C. ("Mother") and sought to terminate her parental rights.[1] Following a bench trial, Mother appeals the trial court's order concerning conservatorship of Justin. The trial court's order appointed the intervening foster parents, S.H. and D.H. ("the Fosters" or "Intervenors"), as permanent non-parent sole managing conservators with the right

---

[1] In parental rights termination cases, to protect the identity of the minors, we refer to the children by a pseudonym or initials and family members by their relationships to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

to designate Justin's primary residence. The trial court further appointed Mother as permanent parent possessory conservator after finding that appointing Mother as a managing conservator would "significantly impair the child's physical health or emotional well-being."[2] In three issues, Mother challenges the trial court's jurisdiction, asserts the trial court erred by allowing the Fosters to participate in the trial absent an order granting them leave to intervene, and argues the trial court erred in its conservatorship determination. We affirm the trial court's order for the reasons discussed below.

## I. Background

In June 2021, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent Child Relationship. The Department supported its Petition with an Affidavit outlining the facts leading to removal. The Department alleged that Mother committed endangering predicate acts under D and E, among others.

**Affidavit in Support of Removal**

In her Affidavit, Department investigator Casaundra Davis described the facts warranting removal. Davis explained that Mother called the police to the home, where they found her locked in a bathroom and hallucinating. Mother admitted using

---

[2]The trial court's order also terminated Father's parental rights, but he is not a party to this appeal.

2

Xanax and methamphetamine and was home alone with Justin, who was six months old. While police were present, Mother had Justin in her arms, and the affidavit noted he had "a small abrasion on his head from incident of [Mother] dropping [Justin.]" The police also found drugs in Mother's home.

Davis described the parents' history with the Department, including the 2018 death of their other infant child, "Ken" while he was in Father's care. The Department concluded there was "reason to believe" regarding "neglectful support" as to Mother and physical abuse for Father in connection with Ken. Ken's cause of death was "blunt head trauma," and the autopsy included a finding of broken ribs.

Davis outlined the parents' criminal history, which showed Mother had a felony conviction for failing to stop and render aid plus arrests for theft, possession of a controlled substance, and burglary. Davis also noted Father's domestic violence convictions and multiple felony convictions for drugs, burglary, and theft, among others. Davis averred that there were "substantial concerns of drug use" by Mother and that parents have "a significant history of serious drug and alcohol use" and a "prior child fatality which was reason to believe for physical abuse."

**Placement with the Fosters and Services for Mother**

On June 24, 2021, just after removal, the Department placed Justin with the Fosters. He was six months old. On June 29, 2021, the Department was appointed Justin's temporary managing conservator.

The Department created a service plan for Mother to address her addiction issues, including counseling, drug testing, and addiction programs, among others. After the Department removed Justin, Mother had positive hair follicle tests for methamphetamine and amphetamine in June 2021 and November 2021. Beginning in January 2022, Mother had a period of negative drug tests that continued until April 2022. In May, June, and July of 2022, Mother failed to appear for drug tests. An August 2022 Permanency Report to the Court noted that Mother's last visit with Justin was in early May 2022. Later in May, Mother cancelled visits with him, and the report explained that "Mother feels she cannot bear the stress of knowing he might not be coming home, and the emotional trauma is overwhelming to her." The report also noted that until then, Mother had participated in services.

**Mother's Relapse**

Sometime in May or June 2022 Mother relapsed, after completing drug treatment. Mother attributed her relapse to seeing her older child's autopsy report for the first time and learning that Father was responsible for his death. According to Mother, during her relapse, she used methamphetamine three times. Despite this relapse and admitted previous drug use, Mother denied that she was a drug addict, rather she considered herself a casual and moderate user of methamphetamine. Between May 2022 and September 2022, Mother cut off all contact with the Department and did not visit Justin.

4

**The Department's Change of Plan and Fosters' Intervention**

Sometime in September 2022, Mother contacted her caseworker to resume services. Mother's September 2022 hair follicle test was positive for methamphetamine and amphetamine, which the caseworker said pointed to Mother using drugs within the last ninety days.

Around the same time or a few days later, the Department removed Justin and two other foster children from the Fosters' home after one of the other foster children arrived at daycare with injuries to his face. Testimony from some Department witnesses showed that abuse concerns against the Fosters were ruled out, while another Department witness testified they ruled "unable to determine" regarding abuse, and a daycare witness felt the foster child had an allergic reaction, which appeared to respond when they administered Benadryl. The attorney ad litem and CASA also represented that the Department advised her the abuse allegations had been ruled out. Even so, the Department's attorney told the trial court that they were "unable to determine."

On September 26, 2022, after the Department removed Justin, the Fosters filed their Petition in Intervention in Suit Affecting the Parent-Child Relationship or, Alternatively, for Termination and Adoption. The Fosters alleged they had standing to intervene under Family Code sections 102.003(a)(12), 102.004(b)–(b-1), and 102.005(3), (5). The Fosters also filed a Motion for Reinstatement asking the trial

5

court to return Justin to their home, which the attorney ad litem supported but the Department opposed. In late October and early November 2022, the trial court conducted evidentiary hearings concerning Justin's placement and possible return to the Fosters over two days. After the first day of testimony in these hearings and forty-two days since he was removed from the Fosters, the trial court ordered Justin returned to the Fosters, where he remained while the case was pending. Justin's CASA and attorney ad litem supported this decision and believed it was in Justin's best interest. It was during the October hearing that Mother and the Department first raised the issue of a monitored return.

Additional hearings leading up to trial addressed Mother's Motion for Transitional Monitored Return and increasing her visitation time to overnight and weekend visits under an abbreviated schedule given concerns about the approaching dismissal date. The trial court held more permanency hearings. During these other hearings, the CASA and attorney ad litem disagreed with the monitored return and continued to express concerns about Mother's relapse, sobriety of less than six months, mental health, lack of a support system, her positive hair follicle test in September 2022, and untruthfulness with the court at times. The CASA testified that the first six-month extension "was so that she could do this extra counseling and to give her a chance to prove herself, and that was just almost immediately after that she went totally off the rails." They also noted how well Justin was doing with the

6

Fosters, his bond with them, and his length of time with them. In these later hearings, the Department continued to support a monitored return to Mother, focusing on her progress since she resumed services in September 2022.

**Dismissal Date and Extensions**

As noted above, on June 29, 2021, the trial court appointed the Department Justin's temporary managing conservator. Since the Department's original dismissal deadline fell on Monday, July 4, 2022, a holiday, the Department's deadline rolled to the next day, July 5, 2022.[3] The docket sheet does not reflect the trial court granted or ruled on an extension before this date. Likewise, the clerk's record does not show that the trial court signed an order extending this deadline before this date. However, the supplemental reporter's record shows that on April 21, 2022, before the original dismissal date passed, the trial court extended the deadline 180 days after Mother argued she needed more time to complete counseling. The trial court moved the dismissal deadline from June 28, 2022, to December 28, 2022.

That said, on November 4, 2022, Mother filed her Motion for Transitional Monitored Return of Justin. In that Motion, Mother stated,

> Before the dismissal deadline on this case of June 27, 2022, the case was extended pursuant to Tex. Fam. Code § 263.401(b) to a final dismissal date of December 22, 2022. At that time, the primary goal of The Department was changed from parent reunification to adoption with secondary goal being parent reunification.

---

[3]The parties have incorrectly provided various other dismissal deadlines in the record and briefing.

7

On December 1, 2022, the trial court granted Mother's Motion for Transitional Monitored Return and extended the dismissal deadline another 180 days to May 30, 2023, based on the monitored return.

## II. Evidence at Trial

Trial began on May 4, 2023, and trial proceedings resumed on July 5, 2023.[4] At the outset, the Department represented it was no longer seeking termination of Mother's parental rights and abandoning the termination grounds as to Mother. Although the Fosters' Petition in Intervention requested termination as alternative relief, by the time trial started, they no longer sought termination either. Instead, the Fosters sought to be named Justin's joint managing conservators with Mother but asked the court to give them the right to designate his primary residence. The first day of trial testimony focused on Father, who had not seen Justin since he came into the Department's care. He was convicted of assaulting Mother while the case was

---

[4]The Fosters claim in their brief that trial on the merits began on October 27, 2022. Elsewhere, the reporter's record indicates the trial began on May 4, 2023. Likewise, the trial court's written judgment states that trial occurred on May 4, 2023, and July 5, 2023. The signed, written judgment prevails over a conflicting docket sheet entry. *See Garza v. Tex. Alcoholic Beverage Comm'n*, 89 S.W.3d 1, 7 (Tex. 2002) (explaining when there is a conflict between the date judgment was rendered, the date on signed judgment prevails over docket sheet and explaining "the signed judgment takes precedence over the docket sheet entry"); *Barnes v. Deadrick*, 464 S.W.3d 48, 53 (Tex. App.—Houston [1st Dist.] 2015, no pet.) ("[A] docket-sheet entry cannot contradict, overrule, or take place of a written order or judgment.") (citations omitted).

pending, and he received a thirty-five-year prison sentence. The trial court terminated Father's rights on predicate grounds N, O, and Q. The second day of trial testimony focused on Mother and the conservatorship determination.

**Destiny Moffett's Trial Testimony**

Destiny Moffett was Justin's assigned CPS conservatorship caseworker until May 2023, and Justin was two during trial. Moffett said that Justin "came into care due to neglectful supervision and physical abuse[,]" and Mother had substance abuse issues. Moffett testified that when removed, Justin had bruises and was solely in Mother's care at that time, hence the "reason to believe" determination for physical abuse.

Moffett testified the Department developed a family plan of service for Mother and went over it with her. The items in the service plan required her to complete random drug testing, complete an ADAC assessment and follow its recommendations, undergo a psychological evaluation and follow its recommendations, participate in individual counseling, participate in parenting classes, and maintain stable income and housing. Moffett testified that Mother completed her services, but there were some issues and "a little bit of a slow start." Moffett explained that Mother started services, but then she stopped communicating with the Department, participating in services, and visiting Justin. Mother eventually returned, reinitiated services, and completed them. Moffett testified that when

Mother returned, she did more than the Department requested by voluntarily continuing counseling after completing the requisite number of sessions.

During the case, Mother had "a couple of concerning drug tests," and the last "concerning" test was in September 2022. In 2022, for four or five months, Mother had no visits and asked them to stop. During that time, Mother relapsed, which Moffett understood was "due to having reviewed the records of the death of her first son." That child's death "was ruled a fatality due to physical abuse." The child was in Father's possession at the time.

The parties discussed the Department's records with Moffett, which were admitted into evidence. These records contradicted Mother's claims that she learned Ken's cause of death for the first time in the summer of 2022, which she claimed caused her relapse. Moffett read portions of the record, which show that as early as June 25, 2021, a Department investigator visited Mother in jail the day after Justin was removed and expressed concerns to Mother about Ken's death. The records reflect that the investigator told Mother the cause of Ken's death was "blunt force trauma and manner of death was homicide." The records also show that Mother denied ever viewing Ken's autopsy report when she saw the investigator while she was in jail, and when she was in jail, she told the investigator she did not know why Ken died because it was not explained to her. Moffett also read a portion of the

records that said, "[Mother] stated the whole thing was very traumatic and [Father] tried to commit suicide."

When visits resumed in September 2022, Mother's hair follicle test was positive for methamphetamine. Before that positive test, Mother informed Moffett she had relapsed and had last used controlled substances a couple of months before, which aligned with Mother's positive hair test. Mother was convicted of possession of a controlled substance stemming from the night Justin was removed. All Mother's drug tests after September 2022 have been negative.

Moffett testified the Department was not currently concerned about Mother's drug usage. When Moffett stopped handling the case, Mother had overnight and weekend visits with Justin. Moffett did not note any concerns during these visits, and their interactions seemed appropriate. Mother's home is clean, there is food, and Justin has his own room, bed, and toys. Moffett said the interactions between Justin and Mother's roommate were fine.

Moffett testified that Justin was placed with the Fosters for most of the case but was removed for about six weeks before the court ordered Justin returned to the Fosters. Moffett testified that Justin has done well with the Fosters, and there are no concerns since his return. Moffett said Justin is safe and happy there.

Moffett testified the Department is seeking to return Justin to Mother. Moffett explained that Mother "has successfully completed her entire service plan. She's

11

been able to demonstrate her sobriety, her appropriateness in parenting. She has a stable house and income. Her interactions with [Justin] have been great with no concerns, and they appear to be bonded and go well." Moffett explained that the purpose of Department conservatorship is to put the child in a temporary placement while they work with the biological parents to ensure they can provide a safe and appropriate home, which Mother has done. Moffett did not believe it was in Justin's best interest for Mother's parental rights to be terminated or to be kept away from her.

**Davietta Green's Trial Testimony**

Davietta Green, another CPS caseworker, testified she has been assigned to the case for about a month. Green said she could not offer any more information than Moffett, since she is so new. She is unaware of any concerns with Mother's visits or the current placement. Green testified the Department's goal is family reunification.

**Ashley Pittner's Trial Testimony**

Ashley Pittner, the manager and director of Justin's daycare, also testified. Justin has attended the daycare for over a year, and Pittner has interacted with Mother and the Fosters. Pittner said she has no concerns about the Fosters' care of Justin, and he is excited when they pick him up. Pittner said Mother never asked how his day was but agreed that Mother was friendly and receptive to feedback about Justin. Pittner testified that Justin is not reluctant to go with Mother and is happy,

but said it was not the same level of excitement as when others pick him up. Pittner described Mother's relationship with Justin as "if I didn't know the situation outside of what I do know I would think she's his favorite aunt, his fun aunt, the one who takes him away to go do fun stuff."

Pittner testified that they have noticed on Mondays and Tuesdays, after long visits with Mother, that Justin is "a little more emotional, he's more aggressive, and he acts out of character." Pittner recalled that after the first or second visit with Mother, Justin was "[p]retend smoking" with a green crayon. Pittner explained that Justin becomes physically aggressive with other students and defiant of his teachers and described an incident where he intentionally shoved another child. Before Justin began overnight visits with Mother, he did not hit but does now, and she denied that he had issues with physical aggression previously. The behavior occurs early in the week, and he has "mellowed out" by the end of the week. Pittner also testified that once Mother brought a strange man to the daycare when she picked up Justin, who she described as having a "face tattoo" and who made her "uncomfortable" enough that she recorded him while he was there.

Pittner agreed behavioral changes can be normal for a two-year-old, and testified she was not a child therapist. Pittner testified she did not know if Justin's issues had to do with being with Mother or leaving her.

**Mother's Trial Testimony**

Mother testified she worked her service plan but relapsed when she learned Father murdered Ken. Mother testified that when she confronted Father about it, he beat her, was convicted, and sentenced to thirty-five years. Mother said she would not be around Father again. She is still dealing with Ken's death through counseling and has learned how to cope without using drugs.

Mother testified that she did not recall a CPS investigator relaying concerns about Ken's death while she was in jail and telling her the autopsy showed Father was responsible or where she could get a copy of the autopsy report. She also did not recall telling the investigator that Ken's situation was very traumatic and that Father tried to commit suicide, but she testified Father had tried to do so by stabbing himself in the stomach. Mother testified her attorney was the first person to give her the autopsy report and did so after a hearing in the summer of 2022. Mother testified that although the attorneys asked questions about Ken's death, she did not seek information about his cause of death.

According to Mother, after learning Ken's cause of death in the summer of 2022, she began using methamphetamine and Xanax again. Mother explained that in July 2022, she confronted Father about Ken's death by going to his hotel unannounced. She told Father what her lawyer said and showed him a copy of the autopsy report. Mother said when she did, Father became violent, denied it, and

choked her. Mother described the assault and agreed she could have died that night but said she escaped when someone knocked and Father went to the door. Despite knowing Father's violent tendencies and criminal history, Mother testified she chose to put herself in a dangerous situation by going to his hotel room at night unannounced. She agreed this called into question her decision making and willingness to place herself, and possibly Justin, in dangerous situations.

Mother testified that she used twice when she relapsed but has not used since. She also denied she physically injured Justin other than bumping his head the night he was removed. Mother agreed she called police the night Justin was removed and had taken methamphetamine and Xanax the day before and was possibly still high. Mother explained that she tripped over a belt buckle while holding Justin when the police were there, and he hit his head. Police took her into custody, and Justin went to the hospital. Mother testified that after Justin was removed, she did not see him for five months, which she attributed to her sobriety. Father was incarcerated when Justin was removed and had been since Justin was a week old.

Mother testified she used drugs in the summer of 2022 during her relapse and thought she had been sober since August but could not provide an exact date. When Justin came into care in June 2021, they were scheduled for trial in June 2022 but there was an agreement to give her six more months to get sober and establish a good environment for Justin. Mother testified that when she relapsed, she discontinued

15

her visitation because that was in Justin's best interest. Mother explained her triggers included driving certain places in San Jacinto County and "seeing a Ziploc bag," among others. To address this, she is trying to sell her house and move out of the county.

Mother testified she has a job making $10.50 per hour and works about thirty-two hours per week, and her hours are inconsistent. Mother testified her current employer has agreed to adjust her schedule to ensure she has childcare for Justin. Mother testified it was hard to find a job in Polk or San Jacinto County, which is why she works at Circle K. Mother has her home for sale for $199,000, which she owns free and clear. She is looking for employment in the Montgomery-Magnolia area and plans to get a new home and vehicle. Mother identified her support group as her employer, coworkers, and Ronnie. Mother explained her friend, Ronnie, no longer lives with her but continues to help her and will help assist with daycare.

Mother did not know Justin's weight when he came into care but learned through court hearings he was significantly underweight. Mother testified that the last time she took Justin to the doctor, he was two months old. Mother denied that Justin's pediatrician told her he was underweight, but they struggled with him eating formula, and she described him as "colicky." Mother testified she did not know who Justin's current doctor or dentist are, because she has not taken him.

Mother explained that the man she brought to the daycare with her was "just a friend," who she had known for about six months. She met him at work and has not left Justin alone with him. She sees him regularly, trusts him, and denied he had a criminal background. She denied a romantic relationship with him.

Mother testified she loves Justin, he is happy when he is with her, and is not sad to be away from the Fosters. Mother believed the Fosters should remain part of Justin's life, since he spent most of it with them, and it would be "very difficult for him" to completely sever that relationship. Mother testified she wanted her son back but knew he has a "full relationship with the [Fosters] as well as their two sons, and I don't want to take that from him." Mother felt she should be the primary caregiver and did not feel the Fosters should have any legal rights to Justin, and she testified that as the parent, she is the best person to determine with whom he associates. She did not want the court to order access for the Fosters, but she said she would let them see Justin. Mother agreed to coparent if she had to for Justin's best interest, but it is not what she wants. Mother also testified it could be a trigger for her, since she was essentially asking for an all or nothing ruling.

**Diana Pelham's Trial Testimony**

Diana Pelham, Justin's assigned CASA and guardian ad litem, also testified. Pelham has visited Justin regularly at the Fosters' home, the daycare, and Mother's home and attended all hearings. Pelham testified that "[Justin] has spent most of his

life with [the Fosters]. He is very dedicated and very attached to them, and to their children. It would be, for him to not be there any longer would be very traumatic for him." Pelham said the Fosters have consistently been there for Justin.

Pelham believed it was in Justin's "best interest to be in a very stable environment," and not be "torn away from what he knows." She explained how the trauma of being moved from what he knows at this young age could negatively impact him for life and "will have an effect on his development and his brain." Pelham testified, "I'm not a specialist but I have read Dr. Perry's research on that and he is very, very empathetic [sic] about early childhood traumas having an effect on the rest of the child's life."

Her role is to say what is in the child's best interest, and there are many ways she comes to her conclusion. Pelham testified it was okay that Justin loves Mother and the Fosters. Pelham testified it was very hard when Justin was removed from the Fosters for six weeks in the fall and described him as "traumatized" when he returned, "He was, it was like almost he didn't trust anybody or anything but yet he wanted to. And he was, I would call it traumatized."

Pelham testified she has no concerns about the Fosters' ability to care for Justin but does have concerns about Mother's ability to do so. Pelham explained that Mother has only been sober a short time, so her demonstrated ability to stay off drugs concerns Pelham. According to Pelham, Mother had not always been truthful with

the court. Pelham testified the CPS records in evidence showed that Mother learned right after Justin was put into custody about Ken's death, which was earlier than Mother claimed. Pelham also noted the domestic violence between Mother and Father plus Mother's drug use. Mother's drugs of choice are methamphetamine and Xanax. Pelham testified that the fact Mother was absent for months shows a lack of stability for the child. She was also concerned about the man Mother brought to daycare. Pelham testified about what Mother struggled with and why it was a risk to return Justin to her. She would feel better if the Fosters are still in the picture.

Pelham agreed Mother had not used drugs in almost a year. Pelham testified that even if the Fosters are a better place, Mother has done nothing in the last few months that warrants taking her parental rights away. Pelham recently visited Justin when he was with Mother. She noted that Mother was appropriate, and he seemed affectionate and comfortable.

Pelham recommended that the Fosters be the primary conservators and that Justin live with them. Pelham testified, "I feel like he should stay where he is as his main, main residence. I feel like he should have visitation with [Mother]." She explained the Fosters wanted Mother to have Justin every other weekend like a noncustodial parent. Pelham believed that if the court appointed Mother the primary instead, then the court should still order access for the Fosters. Pelham testified it would not be good to cut them out of his life, because "That's what he knows. That's

what he's grown up with." Pelham could not identify any specific harm that would come to Justin by being placed with Mother instead of the Fosters.

**S.H.'s Trial Testimony (Foster Mother)**

S.H., Justin's foster mother, also testified. S.H. explained that the overnight visits with Mother have been hard on Justin and described his behaviors after the visits. S.H. testified that when he returns from visiting Mother, he is "[v]ery clingy," "[v]ery excited to see" S.H. and does not want S.H. out of his sight. S.H. described Justin's behavior problems since the visits started, including biting, hitting, and screaming. S.H. testified that Justin had been very well-behaved before the visits began but is not now. S.H. also described an incident that occurred after Justin visited Mother where he spit in S.H.'s newborn niece's crib and after being corrected, he laughed and tried to do it again. Twice Justin complained of a stomachache when they told him he will see Mother.

S.H. testified that when Justin came to them, he had been solely in Mother's care. When he arrived, he was in the fifteenth percentile for weight and struggled to eat more than four ounces at a time. They had to wake up and feed him every two hours so he would gain weight, which is abnormal for a six-month-old. He had a flat spot on his head, which required significant tummy time to correct. When he arrived, he was not hitting six-month milestones like rolling over or pulling up and could

only sit up with "maximum assistance." The Fosters have worked hard to remedy those things, and Justin is now hitting all his milestones.

S.H. shared the CASA's concerns about Mother, which is one of the reasons they asked to be appointed primary managing conservator. Mother testified that another concern was that Justin knows things a child his age should not – like smoking. They are worried about the type of men Mother may bring into Justin's life given her history of inappropriate relationships and noted the man Mother brought to daycare.

S.H. testified that Justin would "be devastated" if he never saw them again, and it would be traumatic for him. S.H. described how difficult it was for Justin when he was removed from their home in the fall and how he behaved when he returned. When asked what Justin was like when he returned, S.H. testified, "Sad, but happy that he was home. He wouldn't let me go. Mama was the first thing out of his mouth. He just hung to me like a little spider monkey. You know, just, I guess he was scared that somebody was going to take him again."

S.H. believes Justin loves her and Mother. S.H. described the bond Justin has with her two older biological sons. She felt they could coparent with Mother, and they would compromise since that is what was best for Justin. Yet, S.H. understood that if Mother prevailed, Mother did not want ordered visits, and the Fosters would not have access to Justin despite Mother's assurances they would.

S.H. disputed Mother's claim that she did not see him for five months after he came into care and testified that was untrue. S.H. discussed a calendar she kept of visits with Mother and testified that, even being generous, Mother only visited 61% of the time. A copy of the calendar was admitted into evidence. The calendar also showed that Mother's supervised visits with Justin began in early July 2021.

S.H. discussed their Amended Relief Requested, which was admitted as an exhibit. The Fosters asked the court to appoint them and Mother as joint managing conservators but that she and her husband have the right to designate Justin's residence and continue to make medical and educational decisions. They requested that Mother have a noncustodial parent possession schedule of alternating weekends and holidays. S.H. detailed the things each party would be prohibited from, including drugs, smoking in front of Justin, having unrelated overnight guests, and corporal punishment. S.H. testified those things were in Justin's best interest. S.H. also testified it was in Justin's best interest to remain with her family, for them to have custody, and share custody with Mother.

**Conservatorship**

The trial court terminated Father's parental rights. The trial court found that "the appointment of [Mother] as managing conservator would not be in the best interest of the child, [Justin], because the appointment would significantly impair the child's physical health or emotional development." The trial court appointed the

Fosters as permanent nonparent sole managing conservators and Mother as Justin's permanent parent possessory conservator. Mother appealed.

### III. Analysis

**A. Jurisdiction: The trial court extended the dismissal deadline.**

In her first issue, Mother argues that the trial court failed to properly extend the original dismissal deadline, so it automatically lost jurisdiction over the matter when the original one-year deadline expired. If true, this meant the trial court's jurisdiction lapsed before the Fosters intervened. Mother also contends that even if the trial extended the original dismissal deadline, it failed to extend the case a second time for a monitored return under Family Code section 263.403(a)(2)(B).

We review de novo issues implicating a court's subject-matter jurisdiction. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018); *In re K.B.*, No. 09-19-00239-CV, 2019 WL 6598618, at *3 (Tex. App.—Beaumont Dec. 5, 2019, no pet.) (mem. op.). The Texas Family Code provides,

> Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order.

Tex. Fam. Code Ann. § 263.401(a). On June 29, 2021, the trial court signed an order appointing the Department as temporary managing conservator. The first Monday following the expiration of a year fell on July 4, 2022, a holiday. *See id.* This meant the dismissal deadline rolled to July 5, 2022, after which the trial court would have automatically lost jurisdiction unless trial began.[5] *See id.*; *see also* Tex. R. Civ. P. 4 (explaining that the last day of a computation period falling on a legal holiday runs until the end of the next day which is not a Saturday, Sunday, or legal holiday).

A trial court may extend the original dismissal deadline in such cases for 180 days if it "finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." Tex. Fam. Code Ann. § 263.401(b). Mother contends that because there was no written order or docket entry extending the case, it was automatically dismissed. Although the record does not contain a written order or notation on a docket sheet, the Supreme Court of Texas recently clarified that, while preferred, a trial court does not have to sign a written order granting an extension. *See In re G.X.H.*, 627 S.W.3d 288, 298–99 (Tex. 2021). An order extending the deadline can be made orally. *See id.* ("Family Code section 101.026 permits trial

---

[5]Mother incorrectly calculates the dismissal date in her brief as June 24, 2022. Elsewhere in the record, the parties calculate the dismissal deadline as June 28, 2022.

24

courts to render orders orally in the presence of the court reporter or in writing on its docket sheet or by a separate written instrument."); *see also* Tex. Fam. Code Ann. § 101.026 (same).

The record before us reflects the trial court granted such an extension. On April 21, 2022, Mother moved for an extension and requested additional time to complete services. The record reflects the trial court orally granted this 180-day extension. In her Motion for Transitional Monitored Return, Mother stated, "Before the dismissal deadline on this case of June 27, 2022, the case was extended pursuant to Tex. Fam. Code § 263.401(b) to a final dismissal date of December 22, 2022." As a clear, deliberate, and unequivocal statement, this constitutes a judicial admission by Mother that the trial court extended the dismissal deadline before it expired under section 263.401(b). *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000) (citation omitted). A judicial admission occurs when an assertion of fact is conclusively established in live pleadings, making the introduction of other pleadings unnecessary, and barring the party from disputing it. *See id.* (citations omitted).

Based on the trial court orally granting the extension and Mother's unequivocal admission in her Motion for Transitional Monitored Return, we conclude the trial court extended the original dismissal deadline pursuant to 263.401(b), before it automatically lost jurisdiction. *See* Tex. Fam. Code Ann. §

263.401(b); *In re G.X.H.*, 627 S.W.3d at 298–99. As a result, the matter had been effectively retained by the trial court when the Fosters intervened in September 2022. *See* Tex. Fam. Code Ann. § 263.401(a).

In issue one, Mother also challenges the trial court's second extension on December 1, 2022, to allow for a "monitored return." Family Code section 263.403(a) allows for another extension of 180 days if the trial court orders the child's monitored return to the parent. *See id.* § 263.403(a)(4), (b). In support of this argument, Mother asserts that "the trial court did not grant a 'monitored return,' and instead Appellant was given just four hours per week of visitation."

We will assume without deciding for purposes of this analysis that Mother's contention is correct, and the trial court did not effectively extend the case again before the December 2022 deadline passed for the monitored return. Even so, the trial court retained jurisdiction over the Fosters' Petition in Intervention. The jurisdictional restrictions and timeline contained in 263.401(a) only apply to suits brought by the Department—not private parties. *See id.* § 263.401(a); *In re C.D.*, No. 05-21-00768-CV, 2022 WL 484559, at *2 (Tex. App.—Dallas Feb. 17, 2022, no pet.) (mem. op.) (noting same); *In re L.D.R.*, No. 05-21-00369-CV, 2021 WL 5104376, at *3 (Tex. App.—Dallas Nov. 3, 2021, no pet.) (mem. op.) (same). On September 26, 2022, the Fosters filed their Petition in Intervention when, as explained above, the trial court still had jurisdiction over the case.

We overrule issue one.

## B. Standing: The Fosters were entitled to maintain this suit under the Family Code.

In issue two, Mother challenges the Fosters' standing to intervene based on: (1) the Fosters' failure to obtain leave from the trial court; and (2) the trial court's failure to determine that appointing her as sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development. Thus, she contends the trial court's final order was void.

"A party seeking conservatorship of a child must have standing to do so." *In re K.J.*, 676 S.W.3d 186, 189 (Tex. App.—Tyler 2023, no pet.) (citation omitted). "A petitioner seeking conservatorship has the burden to prove standing." *In re D.P.*, No. 09-22-00411-CV, 2023 WL 5284862, at *5 (Tex. App.—Beaumont Aug. 17, 2023, no pet.) (mem. op.) (citation omitted). "'Standing is a component of subject matter jurisdiction and is a constitutional prerequisite to maintaining a lawsuit under Texas law.'" *In re W.G.R.*, No.09-21-00293-CV, 2022 WL 1493263, at *3 (Tex. App.—Beaumont May 12, 2022, no pet.) (mem. op.) (quoting *In re M.K.S.–V.*, 301 S.W.3d 460, 463 (Tex. App.—Dallas 2009, pet. denied)); *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993). As a component of subject matter jurisdiction, constitutional standing cannot be waived and may be raised by a party or court at any time, including on appeal. *See Tex. Ass'n of Bus.*, 852 S.W.2d at 445; *In re K.S.*, 492 S.W.3d 419, 423 (Tex. App.—Houston

27

[14th Dist.] 2016, pet. denied). The test for constitutional standing in Texas requires a "real controversy between the parties, which ... will be actually determined by the judicial declaration sought." *Tex. Ass'n of Bus.,* 852 S.W.2d at 446 (citation omitted).

Along with constitutional limitations on standing, the Texas Legislature has provided a comprehensive standing framework for suits affecting the parent-child relationship. *See* Tex. Fam. Code Ann. § 102.003–007; *see also In re K.S.*, 492 S.W.3d at 423; *In re K.D.H.*, 426 S.W.3d 879, 883 (Tex. App.—Houston [14th Dist.] 2014, no pet.). These Family Code provisions provide additional limitations and are "more restrictive than the constitutional requirement of a justiciable interest." *In re A.M.S.*, 277 S.W.3d 92, 97 (Tex. App.—Texarkana 2009, no pet.) (discussing Texas Family Code Section 102.004). When a statute confers standing, we use that statutory framework to analyze whether the petition has been filed by a proper party. *Jasek v. Tex. Dep't of Fam. & Protective Servs.*, 348 S.W.3d 523, 528 (Tex. App.—Austin 2011, no pet.). "The party seeking relief must allege and establish standing within the parameters of the language used in the statute." *In re K.S.*, 492 S.W.3d at 423 (citing *In re H.G.*, 267 S.W.3d 120, 124 (Tex. App.—San Antonio 2008, pet. denied)); *see also City of Beaumont v. Ermis*, No. 09-15-00451-CV, 2017 WL 1178348, at *9 (Tex. App.—Beaumont Mar. 30, 2017, no pet.) (mem. op.). A

28

petitioner must demonstrate the facts establishing standing existed at the time suit was filed in the trial court. *See In re K.S.*, 492 S.W.3d at 423.

Whether a trial court has subject matter jurisdiction is a question of law we review de novo. *In re H.S.*, 550 S.W.3d at 155; *In re W.G.R.*, 2022 WL 1493263, at *3. In our standing review, "we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties." *In re H.S.*, 550 S.W.3d at 155; *In re D.P.*, 2023 WL 5284862, at *4. When reviewing standing, we take as true all evidence favorable to the challenged party, indulging every reasonable inference and resolving any doubts in the challenged party's favor. *See In re K.J.*, 676 S.W.3d at 189; *In re McDaniel*, 408 S.W.3d 389, 397 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

While we agree that the Fosters did not file a separate motion for leave, Mother incorrectly asserts that "[t]he first mention of the Foster Parents' standing is in the final order." The Fosters addressed standing in both their Original Petition in Intervention and their First Amended Original Petition in Intervention. In their Original Petition in Intervention, they claimed standing under Texas Family Code sections 102.003(a)(12), 102.004(b), (b-1), and 102.005(3), (5). *See* Tex. Fam. Code Ann. §§ 102.003(a)(12), 102.004(b), (b-1), 102.005(3), (5). The Fosters also pleaded that Justin was placed in their home from June 2021 until September 2022 for about fifteen months, "which is at least 12 months ending not more than 90 days before

the date" the intervention was filed. The Fosters also asserted they "had substantial past contact with the child" over the course of his fifteen-month placement" with them, and the intervention "is necessary because the child's present circumstances would significantly impair the child's physical health or emotion[al] development." With respect to conservatorship, the Fosters pleaded that "[a]ppointment of either parent as a sole managing conservator or both parents as joint managing conservators is not in the child's best interest and would significantly impair the child's physical health or emotional development." They also sought termination, specifying acts and omissions by Mother and Father, including constructively abandoning the child and abusing controlled substances, among other things.

Although the trial court did not separately sign an order granting leave to intervene, the trial court's Final Order incorporated two findings relevant to standing. First, the trial court found that the Fosters had standing to intervene under sections 102.003(a)(9), (12) and 102.005(3), (5). Second, the trial court found that appointing Mother as a managing conservator "would significantly impair the child's physical health or emotional development."

We disagree that failure to obtain leave or for the trial court to make an express determination is a component of standing, and Mother points to no authority for that proposition. Rather, obtaining leave is a procedural mechanism required under the statute once a party has established standing. *See* Tex. Fam. Code Ann. § 102.004(b).

30

Even if a party establishes standing, a trial court "may grant leave" indicating a trial court's discretion to allow leave or not. *See id.* Given the current prevailing view against construing statutory requirements as jurisdictional, we are disinclined to interpret a party's failure to request leave as fatal to standing. *See Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76–77 (Tex. 2000) (discussing shift away from statutory prerequisites being jurisdictional). In contrast, standing is conferred on people who meet certain requirements within the Family Code's statutory framework. As such, a complaint to an intervenor failing to obtain leave is something that can be waived and must be preserved by a timely request, objection, or motion. *See* Tex. R. App. P. 33.1(a)(1). The record does not show Mother moved to strike the Fosters' Petition in Intervention. The record likewise does not show Mother objected that the Fosters failed to obtain leave or failed to obtain a determination that appointing Mother as managing conservator or both parents as joint managing conservators would significantly impact the child's physical health or emotional development. *See id.* (requiring a timely, specific objection to preserve error). This problem could have easily been remedied had Mother objected. *See, e.g., In re R.H.*, 09-06-124-CV, 2006 WL 3438075, at *4 (Tex. App.—Beaumont Nov. 30, 2006, no pet.) (mem. op.) (noting same in the context of parental rights termination case where parents failed to object to intervenors' trial participation then complained on appeal of fundamental

31

error and that counsel's performance was deficient). We hold that Mother has waived her complaint that the Fosters failed to obtain leave.

Nevertheless, the record supports that the trial court impliedly granted leave to intervene. Texas Family Code identifies the persons who possess general standing to file an original suit affecting the parent-child relationship and contains an express provision governing the circumstances under which a person may intervene in a pending suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. §§ 102.003(a), 102.004(b); *In re W.G.R.*, 2022 WL 1493263, at *3 (noting same). The Fosters' Original Petition in Intervention asserted standing under Texas Family Code section 102.003(a)(12), which provides that "a person who is the foster parent of a child placed by the Department . . . in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition[.]" Tex. Fam. Code Ann. § 102.003(a)(12). The Fosters' Original Petition also asserted standing under Texas Family Code section 102.004(b):

> . . . the court may grant a grandparent or other person, subject to the requirements of Subsection (b-1) if applicable, deemed by the court to have substantial past contact with the child leave to intervene in a pending suit filed by a person authorized to do so under this chapter if there is satisfactory proof to the court that appointment of a parent as a sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development.

32

*Id.* § 102.004(b). Subsection (b-1) states that "[a] foster parent may only be granted leave to intervene under Subsection (b) if the foster parent would have standing to file an original suit as provided by Section 102.003(a)(12)." *Id.* § 102.004(b-1).

At least two of our sister courts have concluded that 102.004(b) requires a person to ask for leave to intervene. *See In re K.J.*, 676 S.W.3d 186, 190 (Tex. App.—Tyler 2023, no pet.); *In re A.T.*, No. 14-14-00071-CV, 2014 WL 11153028, at *8 (Tex. App.—Houston [14th Dist.] July 15, 2014, no pet.) (mem. op.). Even so, these courts have determined a petition in intervention can constitute a request for leave such that a separate motion for leave is not required. *See In re K.J.*, 676 S.W.3d at 191; *In re A.T.*, 2014 WL 11153028, at *9. Under these circumstances, the trial court could have reasonably determined that the Fosters' Petition in Intervention was a request for leave to intervene as contemplated by section 102.004(b). *See In re K.J.,* 676 S.W.3d at 190; *In re A.T.*, 2014 WL 11153028, at *9. Further, although no separate order granted leave before the Final Order, the trial court allowing the Fosters to participate in the placement hearings and the trial itself showed the trial court implicitly granted the Fosters permission to intervene.

We next turn to Mother's argument that the trial court did not determine "the appointment of Appellant as sole managing conservator or both parents as joint managing conservators would significantly impair the child's physical health or emotional development[.]" We disagree. The Fosters specifically alleged this in their

33

Petition in Intervention, along with specific conduct by Mother and Father and as an alternative to conservatorship sought termination and adoption. For the trial court to allow the Fosters to proceed with their intervention as pleaded in their Original Petition in Intervention, the trial court had to impliedly find that appointing the parents as managing conservators—sole or joint—would significantly impair the child's physical health or emotional development. *See In re K.J.*, 676 S.W.3d at 190 (implying findings that intervenors met foster parent intervention requirements); *see also* Tex. Fam. Code Ann. § 102.004(b).

In addressing whether the Fosters satisfied this prerequisite of Section 102.004(b), we look to our sister court's discussion of that section in *In re K.J. See In re K.J.*, 676 S.W.3d at 191. Section 102.004(b) conditions the ability to intervene on providing "satisfactory proof to the court" concerning specific intervention requirements, which in our case is the "significantly impair" component. *See id.*; *see also* Tex. Fam. Code Ann. § 102.004(b). In ensuring "satisfactory proof" exists, "the trial court acts as a gatekeeper[.]" *In re K.J.*, 676 S.W.3d at 191 (citing *In re K.D.H.*, 426 S.W.3d at 885; *In re A.T.*, 2014 WL 11153028, at *9). "Satisfactory proof" is shown by a preponderance of evidence as the facts existed at the time the intervention was filed. *Id.* (citing *Rolle v. Hardy*, 527 S.W.3d 405, 417 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re S.M.D.*, 329 S.W.3d 8, 13 (Tex. App.—San Antonio 2010, pet. dism'd)).

34

The party attempting to intervene has the burden to show evidence of the parent's specific acts or omissions demonstrating that awarding custody to the parent would result in physical or emotional harm to the child. *See id.*; *Mauldin v. Clements*, 428 S.W.3d 247, 263 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "The evidence must support a logical inference that the specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed, and evidence that merely raises a surmise or speculation of possible harm is insufficient to establish that inference." *In re K.J.*, 676 S.W.3d at 191 (citing *Mauldin*, 428 S.W.3d at 264). In conducting this analysis, "we review the *entire* record to determine if any evidence supports this finding." *See id.* at 192 (citing *Mauldin*, 428 S.W.3d at 264) (emphasis in original).

We now discuss the entire record to determine whether "satisfactory proof" existed of the applicable significant impairment prerequisite in September 2022 when the Fosters filed their Original Petition in Intervention. *See id.*; *Mauldin*, 428 S.W.3d at 264. As noted above, the Fosters' Original Petition in Intervention alleged the parents' appointment as managing conservators, whether joint or sole, would "significantly impair" Justin's "physical health or emotional development." This tracks the language of 102.004(b), which is one of the initial provisions under which they sought standing. *See* Tex. Fam. Code Ann. § 102.004(b).

35

The record shows that the affidavit filed by the Department in June 2021 with its Original Petition outlined that Justin was removed while in Mother's sole care when she called police to her home one night while hallucinating, admittedly high on Xanax and methamphetamine. The removal affidavit also averred that parents have "a significant history of serious drug and alcohol use" and a "prior child fatality which was reason to believe for physical abuse."

In the October 2022 placement hearing, the CASA testified that for four months beginning in April or May 2022, Mother had not engaged with the Department or Justin. During this hearing, the CASA outlined the lengthy concerns she had about Mother, including the death of an older sibling in parents' home, Mother's short period of compliance after being disengaged for months, two pending "reason to believe" determinations against Mother with the Department, the potential for Mother to go to jail, and Mother's family's opinion that she should not have custody. Elsewhere, other evidence established that Mother relapsed in the summer of 2022. A hair follicle test taken on September 26, 2022, the day the Fosters' filed their Original Petition in Intervention, was positive for methamphetamine. At trial, the caseworker also testified that during the initial investigation into Justin's removal, there was a "reason to believe" determination for Mother for physical abuse.

36

Based on the entire record, we conclude that "satisfactory proof" existed when the Fosters filed their Original Petition in Intervention that appointing the parents as sole or joint managing conservators would "significantly impair" Justin's "physical health or emotional development." *See id.* § 102.004(b); *In re K.J.*, 676 S.W.3d at 191–92. The evidence supported a logical inference that Mother's specific, identifiable behavior or conduct will probably result in the child being emotionally impaired or physically harmed. *In re K.J.*, 676 S.W.3d at 191; *Mauldin*, 428 S.W.3d at 264.

We conclude a preponderance of the evidence supported the trial court's implied finding that Mother was not, at the time of the intervention, a suitable person to have custody of Justin and that appointing her as managing conservator would have significantly impaired Justin's physical health and emotional development. *See* Tex. Fam. Code Ann. § 102.004(b); *In re K.J.*, 676 S.W.3d at 192. Thus, the trial court did not err in finding the Fosters had standing to intervene. We overrule issue two.

## C. Conservatorship and Parental Presumption: The trial court did not err in its conservatorship determination.

In her third issue, Mother contends the trial court erred by naming her a possessory conservator and the Fosters as joint managing conservators and giving the Fosters the right to designate the child's residence, because the Fosters "never overcame the parental presumption." In support of this issue, Mother argues that the

37

presumption exists that requires her to be the sole managing conservator of a child or the conservator who has the exclusive right to determine the child's primary residence. Mother contends that by asking to be appointed joint managing conservators with her, the Fosters have argued for the parental presumption and against their "participation in the lawsuit because they essentially argued against there being a significant impairment to the child's physical health or emotional development if Mother were to be terminated."

The trial court's written order noted that "[t]he Court finds that the appointment of [Mother] as managing conservator would not be in the best interest of the child, . . . because the appointment would significantly impair the child's physical health or emotional development." It appointed Mother as "Permanent Parent Possessory Conservator" and the Fosters as "Permanent Non-Parent Sole Managing Conservators."

A finding that appointing a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (citing Tex. Fam. Code Ann. § 105.005; *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex.1990)). We review conservatorship determinations for abuse of discretion. *See id.*; *In re E.M.*, 2021 WL 1418234, at *8 (Tex. App.—Beaumont Apr. 15, 2021, pet. denied) (mem. op.). "[W]e will reverse

only if the trial court's decision is arbitrary or unreasonable." *In re E.M.*, 2021 WL 1418234, at *8 (citing *In re J.A.J.*, 243 S.W.3d at 616). "As conservatorship determinations are 'intensely fact driven,' . . . the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can feel the forces, powers, and influences that cannot be discerned by merely reading the record.'" *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "[I]n a bench trial, the trial court, as the trier of fact, is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, and may accept or reject all or any part of their testimony." *See Obernhoff v. Nelson*, No. 01-18-00816-CV, 2019 WL 4065017, at *24 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, no pet.) (mem. op.) (citations omitted); *see also In re G.B.*, No. 09-15-00285-CV, 2016 WL 157842, at *4 (Tex. App.—Beaumont Jan. 14, 2016, no pet.) (mem. op.) (explaining in conservatorship proceeding what trial court could reasonably infer from evidence).

There is a "rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." Tex. Fam. Code Ann. § 153.131(b); *see also id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of

conservatorship and possession of and access to the child."); *Danet v. Bhan*, 436

S.W.3d 793, 796 (Tex. 2014) (noting same). Thus,

> unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

Tex. Fam. Code Ann. § 153.131(a). "[T]he fit-parent presumption is 'deeply

embedded in Texas law' as part of the determination of a child's best interest." *In re*

*C.J.C.*, 603 S.W.3d 804, 812 (Tex. 2020). "'[S]o long as a parent adequately cares

for his or her children (*i.e.*, is fit), there will normally be no reason for the State to

inject itself into the private realm of the family[.]'" *Id.* at 814 (citing *Troxel v.*

*Granville*, 530 U.S. 57, 68–69 (2000) (plurality opinion)).

We first address Mother's contention that by asking to be appointed joint

managing conservators with her, the Fosters conceded the parental presumption

applies. We look to the Fosters' First Amended Petition in Intervention, the live

pleading at the time of trial. In that pleading, the Fosters specifically asserted that

appointing Mother as sole or joint managing conservator was not in Justin's best

interest and would significantly impair his physical health or emotional

development. They also pleaded that they wanted to be sole non-parent managing

conservators with the exclusive right to designate his primary residence. *See* Tex.

Fam. Code Ann. § 153.371. At trial, while S.H. testified that they be appointed joint

40

managing conservators with Mother and admitted an exhibited entitled "Amended Relief Requested," they still requested they be allowed to designate Justin's primary residence.

The trial judgment "shall conform to the pleadings[.]" Tex. R. Civ. P. 301. "Pleadings must at a minimum notify the opposing party of the claim involved." *Messier v. Messier*, 389 S.W.3d 904, 907 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citation omitted). The Fosters' Amended Petition in Intervention notified Mother of their claims, and during trial, the Fosters still requested they have managing conservatorship with the right to designate Justin's residence and that Mother be given possession as the noncustodial parent. In context, we disagree that by requesting joint managing conservatorship the Fosters advocated for the applicability of the fit parent presumption to Mother.

We now turn to Mother's allegation that the fit parent presumption was not overcome. Mother argues she went above and beyond to comply with her plan and had been clean for nine months at the time of trial. She argues that her past conduct is not enough to show that she would "significantly impair" Justin's "physical health or emotional development."

The Department and the Fosters abandoned their termination grounds as to Mother, so the parties tried the issue of conservatorship between Mother and the Fosters. As described in our discussion of the trial above, evidence of Mother's

41

specific actions and omissions supports the trial court's finding that appointment of Mother as custodian would substantially impair the child's physical health or emotional development. *See Danet*, 436 S.W.3d at 797 (discussing evidence of parent's specific actions and omissions in the distant past coupled with more recent failures during the case's pendency that supported finding appointing parent would significantly impair the child's physical health or emotional development). This evidence includes Mother's conduct in the more distant past, several years before the May and July 2023 trial dates, such as her drug use, criminal record, and domestic violence. Evidence was admitted showing that before Justin's birth in 2018, Mother and Father had another child whose cause of death was homicide from blunt force trauma while in Father's care but for which there was a "reason to believe" determination by the Department as to Mother. There was also evidence that when the Department removed Justin from Mother's sole care, he was underweight, not meeting his milestones, and had unexplained bruises for which there was a "reason to believe" determination for Mother for physical abuse.

Yet the record also includes evidence of Mother's more recent conduct (within a year) before trial, such as a relapse on methamphetamine with a positive hair follicle test approximately nine months before trial, failing to visit the child for months during this relapse, and placing herself in a dangerous situation with Father despite knowing his propensity for violence. Further, evidence showed Justin

bonded with the Fosters in a stable environment and the emotional harm that could result if he separated from those who provided daily care for him most of his life. Justin was placed in foster care and remained there because of Mother's actions and omissions, and that time was extended due to her months-long relapse. Evidence established that Justin exhibited troubling behaviors since beginning overnight visits with Mother that he had never exhibited before, such as physical aggression, defiance, and pretending to smoke crayons. The CASA also expressed concerns that Mother's period of demonstrated sobriety was relatively short and her drugs of choice were methamphetamine and Xanax. The CASA also testified that Mother had been untruthful with the court at times.

The trial court heard that Mother completed her service plan since resuming services. The trial court also heard testimony that Mother had done nothing specific in the few months before trial that would warrant taking her rights away or cause him serious harm. Witnesses also testified that Mother should not be completely cut out of Justin's life. Mother testified her support system included her Circle K co-workers, her counselor, and a lifelong friend who had been a roommate. That said, witnesses testified that she had no family living in the area, and Mother testified that "triggers" threatening her continued sobriety included driving on roads in the county where she lived and seeing Ziploc baggies.

We defer to the trial court's role as the trier of fact and its weighing of the evidence. *See* Tex. Fam. Code Ann. § 153.002; *Danet*, 436 S.W.3d at 796; *see also In re J.J.R.S.*, 627 S.W.3d at 218; *Obernhoff*, 2019 WL 4065017, at *24. We conclude that the evidence in the record in this case—which includes evidence of misconduct in the more distant past, evidence of more recent misconduct, and evidence of the stability of the child's current placement—together supports the trial court's conservatorship decision. *See Danet*, 436 S.W.3d at 798. The trial court did not act arbitrarily or unreasonably, thus did not abuse its discretion in determining the fit parent presumption was overcome by a preponderance of the evidence, and the child's best interest was served by having the Fosters act as permanent nonparent managing conservators and Mother as the permanent possessory conservator. *See In re J.A.J.*, 243 S.W.3d at 616. (explaining we review conservatorship decisions for an abuse of discretion, i.e., whether the decision was arbitrary or unreasonable).

## IV. Conclusion

Having overruled Mother's issues, we affirm the trial court's order.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on January 23, 2024
Opinion Delivered February 15, 2024

Before Golemon, C.J., Horton, and Wright, JJ.